RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

MICHAEL BIES,

   *Petitioner-Appellee/Cross-Appellant,*

  *v.*

ED SHELDON,

   *Respondent-Appellant/Cross-Appellee.*

Nos. 12-3431/3457

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:00-cv-00682—Susan J. Dlott, Chief District Judge.

Argued: November 20, 2013

Decided and Filed: December 22, 2014

Before: DAUGHTREY, MOORE, and CLAY, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Seth P. Kestner, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee. Dennis L. Sipe, BUELL & SIPE CO., L.P.A., Marietta, Ohio, for Appellee/Cross-Appellant. **ON BRIEF:** Seth P. Kestner, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant/Cross-Appellee. Dennis L. Sipe, BUELL & SIPE CO., L.P.A., Marietta, Ohio, for Appellee/Cross-Appellant.

─────────────

**OPINION**

─────────────

CLAY, Circuit Judge. Petitioner Michael Bies ("Bies") and respondent Warden (referred to in this opinion as "the State") cross-appeal the district court's order granting conditionally in part and denying in part Bies' petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

1

For the reasons that follow, we AFFIRM the district court's grant of a conditional writ of habeas corpus on Bies' claim under *Brady v. Maryland*, 373 U.S. 83 (1963).

## OVERVIEW

Despite the complete absence of physical evidence and Bies' repeated proclamations of innocence, Bies was convicted and sentenced to death in Ohio state court in 1992 for the kidnapping, assault, and murder of a ten-year-old boy in violation of Ohio Revised Code §§ 2903.01, 2905.02, and 2907.02. The State's case against Bies rested almost entirely upon an unrecorded statement that Bies allegedly made to the police following a prolonged and highly suggestive custodial interrogation. The Ohio courts upheld Bies' convictions on direct appeal and in post-conviction proceedings, but vacated Bies' death sentence after determining that he is intellectually disabled,[1] and that his execution is barred by the Eighth Amendment under *Atkins v. Virginia*, 536 U.S. 304 (2002).

In this federal habeas proceeding, Bies challenges his convictions and seeks a new trial pursuant to 28 U.S.C. § 2254. Bies asserts that his constitutional rights were violated during his trial in a number of ways: first, the State withheld exculpatory evidence in violation of *Brady*; second, the trial court improperly allowed Bies' custodial statements to be admitted at trial; and third, Bies' attorney rendered ineffective assistance of counsel. The district court below granted a conditional writ of habeas corpus based on the *Brady* violation, and denied relief on the remaining claims. We affirm as to the *Brady* claim, and decline to consider the remaining claims at this time.

## BACKGROUND

### I.      Relevant Medical History

Bies has been "medically diagnosed and judicially determined to be" a person with intellectual disability. *Bies v. Bagley,* No. 1:00-cv-682, 2012 WL 1203529, at *6 (S.D. Ohio Apr. 10, 2012). Bies has a full-scale IQ of 60 points—the 0.4th percentile. He has "significant

---

[1]The Supreme Court recently began to employ the term "intellectual disability" to describe the phenomenon previously described as "mental retardation." *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014). We have adjusted the terminology in this opinion accordingly.

deficits in intellectual and adaptive functioning and a history of chronic difficulties." (R. 161-1 at 1596.)[2]   His adaptive skills—motor skills, social interaction and communication, personal living skills, and community living skills—are comparable to those of a ten-year old, and fall in the 0.1th percentile.  He is functionally illiterate.

## II.      The Investigation of the Murder of Aaron Raines

In the early morning hours of May 12, 1992, police recovered the deceased body of ten-year-old Aaron Raines ("Aaron") in the basement of an abandoned building in Cincinnati, Ohio. He had been brutally assaulted.  Investigating officers found a palm print as well as imprints of a shoe tread pattern at the crime scene, and hoped to use these physical clues to identify the perpetrator(s).  At least one officer expressed concern about the quality of the palm print, stating that "[t]here [was] going to be great difficulty in identifying any print" matching the palm print from the crime scene.  (R. 135-2 at 1109.)

During the course of their nine-week investigation, investigating officers identified a number of potential suspects.  One potential suspect was a man named Roger Cordray, who had been known to sleep in the abandoned building where Aaron was murdered.   Several neighborhood residents reported that Cordray had been heard confessing to and bragging about killing Aaron.  Investigating officers located Cordray, spoke with him, fingerprinted him, and took pictures of his shoes.   The officers found that Cordray's palm print had "some similarities . . . to the ridge pattern" of the palm print found at the crime scene, but they were unable to make a positive identification.  (R. 135-2 at 1109.)  Cordray denied knowing Aaron or seeing him the night of the murder, and stated that he "would never do anything to a kid."  (*Id*.) Without confirming Cordray's narrative, the officers believed that he was being "pretty truthful . . . about what occurred," and so they did not investigate Cordray any further.  (*Id*.)

Another potential suspect was a local man named Raymond Moore ("Moore"). Investigating officers questioned Moore after receiving a handful of tips suggesting that Moore might be involved in Aaron's murder.  Moore knew Aaron, and told the officers that he was "involved in the search party going around . . . looking for" Aaron on the night he went missing,

---

[2]Citations to the record refer to Page ID numbers.

but claimed to have begun searching for Aaron approximately two hours prior to the time Aaron was reported missing. (*Id.* at 1189-91.) The officers reported that Moore's gym shoes did not resemble those that had left the imprints, and Moore's palm print did not appear to match the palm print recovered from the crime scene. After speaking with Moore, the officers determined that they "kind of believe[d] him," and effectively eliminated Moore as a suspect. (*Id.* at 1191.)

The police received a number of tips and leads pointing to other individuals, but in July 1992, some two months after Aaron's murder, they focused their attention on Darryl "Junior" Gumm ("Gumm"), a man with borderline intellectual disability who would ultimately be convicted along with Bies. Officers first focused attention on Gumm when his adopted sister reported that he was familiar with the abandoned building where Aaron's body was found, and that he had been in the neighborhood on the evening Aaron was killed. "After extensive questioning in which he changed his statement several times, Gumm eventually confessed involvement in the murder[,]" and made statements that led the police to believe that Bies was also involved—though Gumm did not know or provide Bies' name. *Gumm v. Mitchell*, No. 1:98-cv-838, 2009 WL 7785750, at \*2 (S.D. Ohio Sept. 28, 2009) *report and recommendation adopted in part and rejected in part*, 2011 WL 1237572 (S.D. Ohio Mar. 29, 2011). After interrogating Gumm, detectives from the Cincinnati Police Department traveled to Hazard, Kentucky, nearly two hundred miles from Cincinnati, to question Bies about the murder. *State v. Bies*, 658 N.E.2d 754, 757 (Ohio 1996).[3]

## III.    Interrogation and Custodial Statements

Detectives began questioning Bies at the Kentucky Highway Patrol in Hazard, Kentucky at 6:44 p.m. on July 28, 1992. Before turning on the tape recorder, the detectives advised Bies of his *Miranda* rights, and secured his signature on a written "waiver of rights" form. The detectives also questioned Bies briefly before beginning to record the interview at 6:49 p.m. On the record, Bies denied being in Cincinnati on the day of the murder, and told detectives that his experience in Cincinnati was limited to three or four layovers at the bus station. Bies also

---

[3]Bies was residing in Hazard, Kentucky at the time of the murder and subsequent investigation. At trial, Charlotte Jean Baker testified that Bies and Gumm rode to Cincinnati on May 11, 1992, the day before Aaron's body was found, with Charlotte Jean Baker and her parents. *Bies*, 2012 WL 1203529, at \*3.

answered some biographical questions about himself and his family, and denied any involvement in Aaron's murder.

There were arguably some indications of Bies' diminished mental capacity from the outset of the interrogation. For example, Bies told the detectives that he had completed the tenth grade at "Allen Elementary." Although he later corrected himself to "High School," Bies was unable to think of the "exact spelling" of "Allen" without help from the detectives. He also had trouble spelling his in-laws' last name.

After that brief period of initial questioning, the detectives abruptly turned off the tape recorder. At trial, Detective Guy explained that he decided to turn off the tape recorder because "there were many discrepancies" in Bies' story and he "wanted to make him aware of the facts." (J.A. Vol. 3 at 691.) Off the record, Detective Guy "talked to [Bies], told him that there were discrepancies in the story and that [the detectives] had some of the facts and wanted to make him aware of the facts that [they] had that he should know about." (*Id.*; *see also* R. 161-1 at 1627) ("We stopped the question [*sic*] and tape recorder and explain to [Bies] the facts of our investigation"). Detective Guy "explained to [Bies] that [the detectives] knew who he was with, and how he came to Cincinnati, and how he got his ride here, and who he was with in the park next to the vacant building where the homicide occurred." (J.A. Vol. 3 at 766.) Detective Seals' handwritten notes from the interrogation reflect that Bies then confirmed that he got a ride to Cincinnati with three people, including an individual who met Gumm's physical description. The detectives then "[told Bies] more about facts of the [investigation]. Dates and times and about him being seen with [Gumm] in the park next to the vacant [building where] Aaron was found at the [approximate] time Aaron was missing." (R. 161-1 at 1628.) Bies denied involvement in the murder, and stated that he "never killed anyone." (*Id.*)

After nearly two hours of unrecorded fact-feeding and interrogation, the detectives resumed the recording at 8:55 p.m. In his second recorded statement, Bies admitted to being with Gumm on the evening of the murder, but claimed that Gumm was responsible. Bies stated that he had separated himself from Gumm and Aaron, "heard a bang," and later found Aaron's dead body in the basement of the building. (*Id.* at 1619-20.) Bies stated that he "tripped over" the body, used a cigarette lighter to "see what it was," and then, after seeing blood, bent down to

check whether Aaron was still breathing. (*Id.* at 1620.) Bies explained, "I knew there was nuttin' I could do so I just up an' left instead of reportin' it for, for safety of my own life." (*Id.* at 1621.)

Bies' answers ranged from highly detailed, (*see, e.g.*, R. 161-1 at 1621) (stating that it looked like Aaron had been hit in the head with a "steel rod with rivets,") to suspiciously vague, (*see, e.g., id.* at 1618) (describing Aaron as "anywhere from ten to sixteen" and wearing a "[n]avy blue or red tee shirt an' prob'ly blue jeans or corduroys"). When asked leading questions, as he frequently was, Bies simply agreed with the detectives' description of events. (*See, e.g., id.* at 1622-26) (replying "Right." to a series of leading questions). Bies used an uncharacteristically advanced vocabulary and formal terminology to describe certain details, (*see, e.g., id.* at 1625) (explaining that "sexual intercourse between [Gumm] an' the boy did happen,") which, considering Bies has the language skills of a third grader, (*id.* at 1596,) suggests that he was merely parroting what the officers had told him. Bies denied participating in the crimes, and expressed concern about a minor charge he had pending in Indiana for receipt of stolen property. Bies concluded by telling the detectives that he was "willin' to help" with the murder investigation after he cleared up the minor charge in Indiana. (*Id.* at 1629.) Bies' concern was obviously misplaced, and serves as yet another example of behavior that should have alerted the officers as to Bies' diminished mental capacity.

Bies waived extradition to the State of Ohio the next day, July 29, 1992. The detectives drove Bies back to Cincinnati. Although the detectives did not attempt to formally interview him during the three to four hour drive, Bies discussed the facts of the case and told the detectives that he wanted to return to the scene of the murder to try to remember more facts in order to help the investigation.

On the evening of July 29, 1992, the detectives videotaped Bies' walk-through of the abandoned building where Aaron had been murdered. Bies affirmed in the recording that it had been his idea to return to the crime scene and stated that the detectives had treated him well since his arrest. During the walk-through, Bies maintained that Gumm was responsible for the assault and murder, and attempted to narrate the events of the night of the murder. Bies gave specific details in response to some questions, including detailed information about the pipe that Gumm

supposedly used as a weapon and the appearance of Aaron's injuries. However, he gave ambiguous or incorrect answers to other questions and got confused about certain basic facts, including which building was which. When Bies gave conflicting statements, or when there were "discrepancies" between Bies' story and the detectives' evidence, the detectives pointed out the inconsistencies or told Bies that he was "gettin' confused" and suggested a correction that fit with the evidence. (J.A. Vol. 3 at 863.) The detectives also asked many leading questions, which Bies generally answered in the affirmative. At one point, while providing some details about the crime scene, Bies told the detective: "Now I'm just picturin' stuff in my mind . . . like you said to do." (*Id.* at 863.) He appeared eager to please the detectives. Bies concluded by stating, "I've studied the police for seven years an' I wanted to return back to the scene so I could help out with the crime." (*Id.* at 869.) As the district court observed, this statement "strained credulity on its face in light of his earlier statement that he had completed schooling only through the tenth grade." *Bies*, 2012 WL 1203529, at \*8-9.

After the walk-through, the detectives interrogated Bies one final time at the bus stop. This interrogation was not recorded—allegedly because Bies refused to allow the officers to record his statement, although Bies contends that he did not refuse to allow the recording. During this final interrogation, the detectives told Bies that they did not believe that he could have such detailed knowledge about the attack unless he had participated in the assault. The detectives claim that, for the first time in this unrecorded interrogation, Bies finally admitted to participating in the assault and murder. Bies maintains that he did not make any incriminating statements or confess to participating in the crime.

> At trial, Detective Guy summarized the sequence of events as follows:

> We talked to [Bies] prior to starting the recording for the first time [on July 28, 1992], telling him we were going to talk about an incident that occurred in Cincinnati. And he explained to us that he had been in Cincinnati two or three times prior to May 1st on a bus, and then we recorded the statement. After recording that statement, we talked to him again for a period of time making him aware of the facts. That was not recorded. After he had given us the facts, we then made another recorded statement. And on the third one, after we had gone through the same thing we had done on the two previous ones, and we asked him to record it, he refused.

(J.A. Vol. 3 at 774.)

## IV.    Trial, Direct Appeal, and Post-Conviction Proceedings

Bies was indicted for capital murder on August 5, 1992.  He was arraigned two days later, and a trial date was set for less than eight weeks after that.  The court appointed counsel to represent Bies at trial.[4]

Defense counsel filed an unsuccessful motion to suppress Bies' custodial statements, as well as a *Brady* motion asking the Court "to order all law enforcement officials involved in the investigation of the case . . . to turn over and advise the prosecuting attorney of all information obtained during the course of this investigation."  (J.A. Vol. 3 at 819.)  In spite of this motion, much of the evidence gathered during the investigation, including evidence that pointed toward other potential suspects, was never disclosed to Bies or his counsel.  Such evidence was not disclosed due to the fact that, at the time Bies was tried in 1992, Hamilton County had in place a "homicide book" system under which the investigative agency gave to the prosecutor only the evidence that it believed would aid in prosecution.  *See Jamison v. Collins*, 291 F.3d 380, 383 (6th Cir. 2002) ("[The Cincinnati Police Department] would gather inculpatory material into a homicide book that was then sent to the prosecutors; exculpatory material was excluded from the homicide book.")  Consequently, "the prosecutor never became aware of exculpatory evidence, and did not disclose it as required by *Brady*."  *Id.*

In October 1992, Bies was tried and convicted by a jury for kidnapping, attempted rape, and aggravated murder with three death penalty specifications.  The jury heard mitigation evidence from two psychiatrists who testified about Bies' intellectual disability and troubled background, but the jury nonetheless recommended a sentence of death.  The trial court adopted the jury's recommendation.

Bies appealed to the Ohio Court of Appeals, which affirmed his convictions and death sentence in March 1994. *State v. Bies*, No. C-920841, 1994 WL 102196 (Ohio Ct. App. Mar. 30,

---

[4]One of the two attorneys appointed to represent Bies at trial had no prior experience representing a defendant in a murder case, let alone a capital case.  That attorney remained lead counsel for Bies' direct appeal, and was joined by similarly inexperienced co-counsel for Bies' direct appeal.  Neither attorney had ever represented a defendant in a felony criminal appeal.

The Ohio Supreme Court later suspended both attorneys' licenses to practice law for wrongdoing in unrelated matters. *Cincinnati Bar Ass'n. v. Deardorff, Haas*, 702 N.E.2d 59 (Ohio 1998); *Cincinnati Bar Ass'n. v. Haas,* 699 N.E.2d 919 (Ohio 1998).

1994).  In January 1996, the Ohio Supreme Court likewise rejected all of Bies' challenges to his convictions and death sentence, *State v. Bies*, 658 N.E.2d 754 (Ohio 1996), and the United States Supreme Court denied Bies' petition for a writ of certiorari, *Bies v. Ohio*, 517 U.S. 1238 (1996).

In September 1996, Bies filed a petition for post-conviction relief in state court pursuant to Ohio Revised Code § 2953.21.  The trial court denied relief, and the Ohio Court of Appeals affirmed, holding in part that many of Bies' allegations of error should have been raised on direct appeal and were thus barred by the doctrine of *res judicata*.  *State v. Bies*, No. C-980688, 1999 WL 445692, at *6-7 (Ohio Ct. App. June 30, 1999).  The Ohio Supreme Court declined further review.  *State v. Bies*, 719 N.E.2d 4 (Ohio 1999) (table).

On August 21, 2000, Bies filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio.  During discovery for Bies' federal habeas claim, the State turned over exculpatory evidence that had never before been disclosed.  The federal habeas proceeding was held in abeyance to allow Bies to present this new evidence and an accompanying *Brady* claim to the state courts.

In October 2001, Bies filed a second petition for post-conviction relief in state court, alleging in part that the State had withheld evidence in violation of *Brady*, based on the documents which were first disclosed in Bies' federal habeas proceeding.  By entry dated April 16, 2002, the Court of Common Pleas in Hamilton County rejected all of Bies' claims for relief. The court did not issue any written opinion accompanying its entry of judgment.  Bies appealed the denial of his petition, and the Ohio Court of Appeals affirmed.  *State v. Bies*, No. C-020306, 2003 WL 202177 (Ohio Ct. App. Jan. 31, 2003).  The state appellate court found that the claims in Bies' petition were successive and did not meet the requirements of Ohio Revised Code § 2953.23, which requires defendants filing successive post-conviction petitions to show by clear and convincing evidence that their claims are based on a new or retroactively applicable legal right or that they were "unavoidably prevented from discovery of the facts" upon which their claims rest, and that but for the constitutional error at trial, no reasonable fact-finder would have found them guilty.  *Id.* at *1 (citing § 2953.23(A)(1)).  The Ohio Supreme Court declined further review.  *State v. Bies*, 788 N.E.2d 648 (Ohio 2003) (table).

Meanwhile, in 2002, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the execution of individuals with intellectual disability violates the Eighth Amendment's prohibition against cruel and unusual punishment. After an *Atkins* hearing, the state trial court determined that Bies has intellectually disability, and therefore is ineligible for the death penalty. The state trial court vacated Bies' death sentence, and sentenced him to consecutive terms of life imprisonment with parole eligibility after thirty years for the murder, eight-to-fifteen years for the attempted rape, and eight-to-twenty-five years for the kidnapping.

After Bies' death sentence was vacated, the adjudication of his non-*Atkins* habeas claims proceeded in the United States District Court for the Southern District of Ohio. In his fourth claim for relief, Bies asserted that the State failed to provide defense counsel with exculpatory evidence in violation of Bies' Sixth, Eighth, and Fourteenth Amendment rights as recognized by *Brady*. The district court below determined that the State did indeed violate Bies' due process rights by failing to turn over the evidence implicating other suspects that was gathered during the murder investigation, and it granted a conditional writ of habeas corpus on that basis, denying relief on all other grounds. *Bies*, 2012 WL 1203529, at \*37. The district court stayed execution of the writ, and granted a certificate of appealability on four of Bies' remaining claims for relief. *Id.* at \*37-38. The State appealed the partial grant of habeas relief on the *Brady* claim, and Bies cross-appealed the denial of relief on the remaining grounds.

## DISCUSSION

### I.     Exculpatory Evidence Withheld in Violation of *Brady*

It is undisputed that the State failed to turn over hundreds of pages of evidence gathered during the murder investigation. This evidence was revealed to defense counsel for the first time as part of routine discovery during Bies' federal habeas proceeding, almost nine years after his criminal trial.[5] The undisclosed investigative reports included a substantial collection of tips,

---

[5]After learning of this evidence in federal court, Bies presented the evidence to the Ohio state courts in a successive post-conviction petition, which was denied on procedural grounds. *See State v. Bies*, No. C-020306, 2003 WL 202177, at \*1 (Ohio Ct. App. Jan. 31, 2003). Because the state court did not consider Bies' *Brady* claim on the merits, the evidentiary limitation imposed by *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), does not apply, and we may consider the evidence adduced in the federal habeas proceedings. *See Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007).

leads, and witness statements relating to other individuals who had been investigated for the murder——two of whom had apparently confessed to the crime, and neither of whom was ever ruled out as the perpetrator. The State also withheld witness statements that undermine the State's theory of the case and information that could have been used to further impeach two of the State's witnesses. Bies contends that the State's failure to disclose this collection of evidence violated his due process rights, as recognized by *Brady* and its progeny. We agree.

**A.      Standard of Review and Applicable Law**

In a habeas corpus proceeding, we review a district court's legal conclusions *de novo* and its factual findings for clear error. *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012).

Bies' petition for habeas relief is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Under AEDPA, a federal court may not grant habeas relief for any claim adjudicated on the merits in state court unless the state court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d)(2). This "highly deferential standard" is "difficult to meet." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1391 (2011) (quotation marks omitted). However, the stringent requirements of § 2254(d) apply only to claims that were "adjudicated on the merits in State court proceedings." *Id.* When a state court does not address a claim on the merits, as when it applies a state law procedural bar, "AEDPA deference" does not apply and we will review the claim *de novo*. *Cullen*, 131 S. Ct. at 1401; *see also Robinson v. Howes*, 663 F.3d 819, 822-23 (6th Cir. 2011).

The Ohio courts declined to entertain Bies' petition for post-conviction relief, which included his timely *Brady* claim, on the basis that Bies' petition failed to meet the statutory requirements of Ohio Revised Code § 2953.23(A). *See Bies*, 2003 WL 202177, at *1. In summarily rejecting the petition, the Ohio Court of Appeals wrote:

> R.C. 2953.23 closely circumscribes the jurisdiction of a common pleas court to
> entertain a successive postconviction petition: The petitioner must show either
> that he was unavoidably prevented from discovering the facts upon which his

petition depends, or that his claim is predicated upon a new or retrospectively applicable federal or state right recognized by the United States Supreme Court since the filing of his previous petition; and he must show "by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found [him] guilty of the offense of which [he] was convicted." R.C. 2953.23(A).

We conclude that the common pleas court properly declined to entertain the appellant's second postconviction petition, because the record does not demonstrate either that the appellant was unavoidably prevented from discovering the facts underlying his claims or that his claims were predicated upon a new or retrospectively applicable federal or state right recognized by the United States Supreme Court since the filing of his first petition. Accordingly, we overrule his fifth through twelfth assignments of error.

*Bies*, 2003 WL 202177, at *1.[6]  The state court did not address the merits of Bies' *Brady* claim when it applied this state law procedural bar.[7]

Because Bies' *Brady* claim was never "adjudicated on the merits in State court proceedings," the limitations imposed by § 2254(d) do not apply, and we review the claim *de novo*.  The State concedes that Bies' claim was never adjudicated on the merits in State court, and acknowledges that the stringent limitations imposed by § 2254(d) do not apply, asserting instead that Bies' claim is barred under the procedural default rule.  *See* Appellant Br. at 18-23; Reply Br. at 17-18.

### B. Preservation of the Issue and Procedural Default

Because the Ohio Court of Appeals applied a state law procedural bar to reject Bies' *Brady* claim, the claim is procedurally defaulted.  *See Coleman v. Thompson*, 501 U.S. 722, 729-33 (1991); *see also Davie v. Mitchell*, 547 F.3d 297, 311 (6th Cir. 2008) (finding procedural default when the Ohio courts apply Ohio Revised Code § 2953.23).  Unexcused procedural default precludes federal habeas review.  *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

---

[6]Bies' *Brady* claim was set forth as the fifth assignment of error in his second post-conviction petition.

[7]We have consistently found procedural default when Ohio courts have held that Ohio Revised Code § 2953.23 bars them from entertaining a second post-conviction petition. *See, e.g.*, *Broom v. Mitchell*, 441 F.3d 392, 399-401 (6th Cir. 2006).  We note that Ohio courts interpret § 2953.23 as a *jurisdictional* procedural rule. *See Gumm v. Mitchell*, No. 11-3363, slip op. at 16 (6th Cir. Dec 22, 2014).

However, federal courts can excuse procedural default upon a showing of either cause and prejudice or a fundamental miscarriage of justice. *Id.*

To show cause, Bies must establish that some objective factor external to his defense impeded his ability to comply with the state's procedural rule. *Id.* To demonstrate prejudice, Bies must show that the error worked to his actual and substantial disadvantage, "infecting his entire trial with error of constitutional dimensions." *Id.* at 494. "In this case, cause and prejudice parallel two of the three components of the alleged *Brady* violation itself," with the suppression of the evidence constituting cause and the materiality of the evidence resulting in prejudice. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). As explained below, all of the components of a "true *Brady* violation" were indeed present in this case. *Id.* at 281. Therefore, Bies' procedural default is excused.

## C. *Brady v. Maryland*

In *Brady*, the Supreme Court explained that "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87. The Court noted that prosecutors are charged not with winning trials but with seeking justice. *Id.* at 87-88. Premised on this understanding of fairness and prosecutorial responsibility, the Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. In subsequent cases, the Court made clear that the State has a duty to disclose all favorable evidence—even if that evidence is "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437.

There are three components of a *Brady* violation: "[T]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. The third component is sometimes referred to as the "materiality" requirement.

**D. Favorableness and Suppression of the Evidence**

The first two components of Bies' *Brady* claim are not disputed. The State concedes that it possessed and failed to disclose hundreds of pages of evidence gathered during the murder investigation. Moreover, there is no question that the suppressed evidence was favorable to the accused.

**a. Evidence Pertaining to Other Suspects**

The undisclosed investigative reports contained multiple tips and witness statements incriminating other individuals. Investigators amassed considerable evidence suggesting that Roger Cordray might have been responsible for the murder——including numerous reports that Roger Cordray had confessed to the crime. Witnesses told police that Cordray was known to sleep in the abandoned building where Aaron's body was found, and one witness, George Putteet, told police that he had seen Aaron in the vicinity of the abandoned building around 10:30 p.m. on the night of the murder. Putteet further stated that a group of unidentified individuals "were messing with drunks in the alley," including Cordray, and were "calling him names [and] getting him to chase them." (R. 135-2 at 1123.)

Investigators received several reports that Cordray had confessed to numerous people that he had murdered Aaron, and further, that he had bragged about it and was "glad Aaron was dead." (R. 135-2 at 1101; *id.* at 1102.) One witness reported that another man "beat up" Cordray after Cordray said that he and a friend had killed Aaron. (*Id.* at 1119.) Yet another witness reported that Cordray threatened a woman named Christine Robertson that he would harm her if she told anyone about a coat that belonged to him that was discovered in the abandoned building. Anthony Steele and Theresa Wright-Steele told police that Cordray had approached them and said, "I did it. I killed the little kid." (*Id.* at 1105.) Steele and Wright-Steele further reported that Cordray's hands and knuckles were "all scraped up," and, although Cordray was drunk and high on Valium at the time, they believed him when he said that he had killed Aaron. (*Id.* at 1104-09.) Bies' counsel was never made aware that Cordray was a suspect, or that he had been linked to the case in any way.

The State also withheld a good deal of evidence implicating a man named Raymond Moore. Police received numerous reports connecting Moore to Aaron's murder. One witness saw Moore entering the abandoned building around 7:00 p.m. on the night of the murder, around the same time that Bies and Gumm were seen in the adjacent park. Moore told the police that he knew Aaron and had looked for him for several hours after being asked to help search by a police officer around 9:00 p.m.; however, Aaron had not been reported missing until after 11:00 p.m. In addition, Moore had apparently lived in the abandoned building at some point, and Aaron's uncle, William Raines, told police that he noticed Moore acting strangely and that he seemed to be avoiding Aaron's mother.

Although Cordray and Moore were the most notable alternative suspects, the undisclosed police files are replete with references to other individuals who may have had some involvement in Aaron's murder. For example, a witness reported that a man named Reggie Hetsler approached a fifteen-year-old boy at a bus stop in Cincinnati and said that "he killed and raped the little boy at 8th and State along with his brother." (R. 135-2 at 1126-27.) Other suspects included Garland Inman—a man who had previously been adjudicated a juvenile delinquent for the sexual assault of several family members. Inman was seen near the scene of the crime on the night of Aaron's murder. Claude Justice, the subject of a "crime-stoppers" tip, was reported to have used the abandoned building where Aaron's body was found for sex. Several witnesses believed that a man named Luther Hatton had been involved in Aaron's murder because he had a violent criminal history, had been seen near the abandoned building, and mysteriously disappeared after a night of drinking around 10:00 p.m. on the night of the murder. Defense counsel was not made aware of any of these suspects or the evidence connecting them to the crime. At trial, defense counsel did not set forth a compelling alternative narrative of Aaron's murder—in part because counsel was not aware of the existence of any other suspects and was not privy to the evidence implicating those suspects.

### b. Evidence Undermining the State's Theory of the Case

On top of the evidence pertaining to other legitimate suspects, the State also failed to disclose evidence that undermines the State's narrative of the crime. First, the State failed to disclose numerous witness statements that placed Aaron at a local ice cream stand as late as

midnight on the night of the murder. Second, the State failed to disclose the statement of a witness who told investigators that he had seen Aaron in the abandoned building in the past. This evidence undermines the State's theory that Aaron would not have entered the building unless coerced and casts further doubt on the State's narrative of the crime.

**E.  Materiality of the Undisclosed Evidence**

The record in this case unquestionably establishes that the State possessed and suppressed evidence that was favorable to the accused; the only issue in dispute is whether the evidence was "material."  Evidence is material for purposes of *Brady* if the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.  The Supreme Court has emphasized that a defendant is not required to show that the disclosure of the evidence would have ultimately led to an acquittal. *Id*. at 434-35.  In fact, a defendant is not even required to show that he "would more likely than not have received a different verdict with the evidence[.]" *Smith v. Cain*, 132 S. Ct. 627, 630 (2012).  Rather, he must show "only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* at 629; *see also United States v. Bagley*, 473 U.S. 667, 682 (1985) (adopting and applying the "prejudice" standard from *Strickland v. Washington*, 466 U.S. 668 (1984)).

To that effect, the Supreme Court has made clear that it is not necessary that "every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed." *Kyles*, 514 U.S. at 451 (granting habeas relief where the "evidence remaining unscathed" would not have amounted to "overwhelming proof" of the defendant's guilt).  "*Bagley* materiality . . . is not a sufficiency of evidence test.  A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 434-35; *see also Strickler*, 527 U.S. at 290.

In considering whether the failure to disclose exculpatory evidence undermines confidence in the outcome, "the omission must be evaluated in the context of the entire record." *United States v. Agurs*, 427 U.S. 97, 112 (1976) (footnote omitted).  As the Supreme Court observed in *Agurs*, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Id*. at 113.  The

Supreme Court's precedent mandates that we "undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Boss v. Pierce,* 263 F.3d 734, 745 (7th Cir. 2001) (citing *Kyles*, 514 U.S. 419); *see also United States v. Jernigan*, 492 F.3d 1050 (9th Cir. 2007) (en banc).

When the State fails to turn over numerous pieces of favorable evidence, as it did in this case, the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of the trial. *See Kyles*, 514 U.S. at 436-37 (holding that suppressed evidence should be "considered collectively, not item by item").[8] Withheld information is material under *Brady* only if it would have been admissible at trial or would have led directly to admissible evidence. *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995).

Considering the quality and quantity of the evidence that the State failed to disclose in this case, the potential for that evidence to have affected the outcome of Bies' trial is inescapable. Given the strength of the exculpatory evidence that was suppressed by the State, and the relative weakness of the State's case against Bies, the failure to disclose the evidence unquestionably put the whole case in such a different light as to undermine confidence in the verdict. *See Kyles*, 514 U.S. at 441-54; *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006); *Banks v. Dretke*, 540 U.S. 668, 703 (2004).

On its face, the nondisclosure of the identities of the other suspects——two of whom were reported to have confessed to the murder——was an egregious breach of the State's *Brady* obligations. *See Brady*, 373 U.S. at 87; *Kyles*, 514 U.S. at 447; *Jamison*, 291 F.3d at 390-91 (granting habeas relief where the State suppressed evidence pertaining to other suspects). While the State is not necessarily required to disclose every stray lead and anonymous tip, it must disclose the existence of "legitimate suspect[s]," *D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th

---

[8]The district court assessed each item of suppressed evidence individually, and found that the evidence pertaining to "other suspects" was *Brady* material, while the remaining evidence was not. *Bies*, 2012 WL 1203529, at \*15-25. Consequently, the district court "grant[ed] the [*Brady* claim] in part, as to the 'other suspects' subclaim, and [denied] it in part, as to the remainder." *Id.* at \*25. This analysis was incorrect. The Supreme Court has instructed that, rather than assess each item individually, we should evaluate whether, *considered collectively*, the failure to disclose all of the evidence created "a reasonable probability that . . . the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280.

Cir. 2008), especially when such information has been specifically requested by the defendant, as it was in this case. "Withholding knowledge of a second suspect conflicts with the Supreme Court's directive that 'the criminal trial, as distinct from the prosecutor's private deliberations, [be preserved] as the chosen forum for ascertaining the truth about criminal accusations.'" *Jernigan*, 492 F.3d at 1056-57 (quoting *Kyles*, 514 U.S. at 440).

Even armed with only the evidence implicating Roger Cordray, Bies' defense counsel would have been able to construct a plausible alternative narrative of the crime and raise reasonable doubt in the minds of the jurors. Defense counsel could have established, through admissible eye-witness testimony, that a group of people, which may have included Aaron, was taunting Cordray near the abandoned building around 11:00 p.m. on the night of the murder. Eye-witnesses place Aaron in the same vicinity at approximately the same time. Cordray, who was known to sleep in the abandoned building, later confessed to numerous people that he had murdered Aaron.[9] After the murder, a witness noticed that Cordray's knuckles were scraped, and the police identified "some similarities" between Cordray's palm print and the print found at the crime scene. Finally, the police never uncovered any evidence exonerating Cordray; rather, they eliminated Cordray as a suspect apparently because they simply believed him when he denied any involvement in the crime. Taken together, these facts demonstrate that Cordray had the means, motive, and opportunity to murder Aaron. These facts, had they been disclosed, would have provided a compelling counter-narrative to the State's theory of the case and could have created a reasonable doubt as to Bies' guilt in the minds of the jurors.

---

[9]Cordray's confessions are likely to have been admissible at trial, either as prior inconsistent statements under Ohio Rule of Evidence 613 if Cordray had testified, or as statements against interest under Rule 804(B)(3) if Cordray had not appeared or had refused to testify.

Cordray's confessions are supported by sufficient "corroborating circumstances" to fall within the ambit of Rule 804. First, Cordray's confessions were apparently spontaneous, and were not coerced or procured while in police custody. *Cf. State v. Yarbrough*, 767 N.E.2d 216, 235 (Ohio 2002) (hearsay statement was supported by "corroborating circumstances that render [the] statement worthy of belief" where the speaker was "speaking to his wife, not to police; he was at home, not in custody; his statement was spontaneous, and he had nothing to gain . . . ."). Moreover, Steele and Wright-Steele told police that they believed Cordray's confession. Furthermore, Cordray had been seen in and around the building where Aaron's body was found, his hands appeared injured after the murder, and there were "some similarities" between his palm print and the print found at the crime scene. Taken together, these facts would have provided sufficient "corroborating circumstances" to permit the admission of Cordray's hearsay confessions. *See State v. Landrum*, 559 N.E.2d 710, 720 (Ohio 1990) (finding corroborating circumstances when an individual spontaneously confessed shortly after a murder).

In addition, the introduction of the evidence amassed against Cordray, along with the evidence amassed against Raymond Moore, Reggie Hetzler, and other potential suspects whom investigators simply decided to stop pursuing, "would have raised opportunities to attack . . . the thoroughness and even the good faith of the investigation." *Kyles*, 514 U.S. at 445. Defense counsel could have used this evidence to "attack[] . . . the investigation as shoddy," and lessen the credibility of the State's case against Bies. *Id.* at n. 13.

Although the suppression of this evidence alone could have sufficiently tainted the trial, the witness statements reporting Aaron alive later in the evening and placing him in the abandoned building on prior occasions, considered collectively with all of the other suppressed evidence, *see Kyles,* 514 U.S. at 436-37, would have further weakened the State's case against Bies. Although the State never established a definitive timeline of Aaron's movements on the night of the murder, it procured testimony that Aaron was last seen around 7:00 p.m., and presented that testimony alongside evidence that Bies and Gumm were last seen in the park adjacent to the abandoned building at 7:00 p.m. The suggestion that Bies and Aaron were last seen at approximately the same time undoubtedly reinforced the State's fragile case against Bies. By suppressing evidence that numerous witnesses had seen Aaron later that evening, and presenting only uncontradicted evidence that Aaron was last seen at 7:00 p.m., the State strengthened its case against Bies. The undisclosed contradictory evidence suggesting that Aaron was in fact alive much later in the evening could have been used by the defense to disrupt the State's timeline and narrative of the crime.

The capacity for the undisclosed evidence to have affected the outcome of Bies' trial becomes even more apparent when viewed in light of the paltry evidence that the State did present. *See Agurs*, 427 U.S. at 112 (instructing that undisclosed evidence "must be evaluated in the context of the entire record"). The investigating officers never discovered any physical evidence linking Bies to the crime. Bies' shoe treads and palm prints did not match those found at the crime scene; there was no DNA evidence recovered from the crime scene; officers did not find any incriminating evidence on the defendant's person; and there were no eye-witnesses to the crime.

Instead, the State relied on three pieces of evidence:  First, Bies was seen in a park near the abandoned building around 7:00 p.m. on the night of the murder.  The relevance of this fact is clearly dubious given the numerous witnesses who saw Aaron much later that night—evidence which was never disclosed to the defense despite defense counsel's specific *Brady* request.  Second, a jailhouse informant, Steven Clark, testified that Bies had confessed to him while they were imprisoned together at the Hamilton County Justice Center.  However, Clark's credibility was thoroughly undermined on cross-examination, when he was questioned about his pervasive mental health problems and criminal history, including his most recent arrest for corruption of a minor and gross sexual imposition.  Given that Clark was a jailhouse informant whose credibility was prominently called into question, his testimony was not particularly strong evidence.  As the Supreme Court has acknowledged, "[j]urors suspect informants' motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable." *Banks,* 540 U.S. at 702 (quotation marks omitted).  Finally, and most importantly, the State relied on Bies' alleged confession to the murder.  Undoubtedly, a confession "is strong evidence of his guilt," *Harbison v. Bell*, 408 F.3d 823, 834 (6th Cir. 2005), but there are numerous reasons why a jury would have discounted Bies' alleged statements to the police, especially if they were presented with a compelling alternative theory of the crime.

First of all, Bies' alleged confession was neither recorded nor overheard by any impartial witness.  The only "evidence" of the alleged confession is the self-serving testimony of the investigating officers.  Bies disputes their testimony and denies making any incriminating statements during the final interview.  He also denies requesting that the final interview not be recorded.  In all three of Bies' prior recorded statements, he fervently denied participating in the assault and staunchly disclaimed responsibility for the murder.

Second, Bies is intellectually disabled.  He has an IQ in the 0.4th percentile, "significant deficits in intellectual and adaptive functioning," and the communication skills of a ten-year old.  (R. 161-1 at 1596.)  The Supreme Court has warned that defendants with intellectual disability are particularly prone to give false confessions.  *Hall*, 134 S. Ct. at 1993; *Atkins*, 536 U.S. at 320-21; *see also* Morgan Cloud et al., *Words without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects,* 69 U. Chi. L. Rev. 495, 511-12 (2002) (noting that

intellectually disabled individuals are "unusually susceptible to the perceived wishes of authority figures" and have "a generalized desire to please").

Even if the jury believed that Bies did in fact make incriminating statements as alleged, they had good reason to question the legitimacy of his confession. The detectives testified at trial about their strategy of cycling through unrecorded and recorded interrogation periods, giving Bies information that they had purportedly obtained during the course of their investigation while the recorder was off, and trying to get Bies to confirm the information when the recorder was turned back on. (*See* J.A. Vol. 3 at 774) ("We talked to [Bies] prior to starting the recording for the first time . . . and then we recorded the statement. After recording that statement, we talked to him again for a period of time making him aware of the facts. That was not recorded. After he had given us the facts, we then made another recorded statement. And on the third one, after we had gone through the same thing we had done on the two previous ones . . .."). The jury also heard the recorded statements in which the detectives asked leading questions to suggest the answers they desired and heard testimony that Bies was eager to "help" with the investigation. (*See, e.g.*, J.A. Vol. 3 at 697) (during the drive from Kentucky to Ohio, Bies "initiated the conversation every time, as to maybe this would help, maybe this would help, maybe this would help, to that effect.")

Moreover, Bies denied any involvement in Aaron's murder until, after a lengthy off-the-record conversation in which the detectives "made him aware of the facts," Bies told them that he had seen Gumm take Aaron into the building and later found the boy dead. (*Id.* at 1616-26.) At the end of this statement, Bies seemed confused about the extremely serious nature of the murder investigation and the significance of what he had said, telling the detectives that he was willing to help them out further as soon as he could clear up a minor charge in Indiana. (*Id.* at 1625.) During the videotaped walk-through of the crime scene, Bies was confused about which building was which and gave vague details about the crime—some of which were not consistent with the physical evidence. He also used uncharacteristically advanced vocabulary to describe certain details, suggesting that he was merely repeating things that the officers had told him. (*See, e.g.*, *id.* at 866) (describing the weapon as having "rivets").

In light of these considerations, Bies' alleged statements to the police are far from overwhelming evidence of his guilt. Bies had a questionable capacity to understand what was happening to him, and he repeatedly appeared eager to please the officers by offering them information. Although he described the crime scene in some detail, he did so only after having several lengthy off-the-record conversations with police, in which the police "ma[de] him aware of the facts." (J.A. Vol. 3 at 744.) The only time Bies allegedly implicated himself in Aaron's murder was unrecorded, and Bies denies ever making such a statement. To be sure, a jury could have accepted that Bies' confession was genuine notwithstanding these problems; however, if the jury had also been presented with evidence that implicated other individuals in the murder and was inconsistent with the State's and Bies' own accounts of the crime, it may very well have determined that Bies' alleged confession was unreliable.

In this case, as in *Kyles*, "not every item of the State's case would have been directly undercut if the *Brady* evidence had been disclosed." 514 U.S. at 451. "It is significant, however, that the . . . evidence remaining unscathed would . . . hardly have amounted to overwhelming proof" of the defendant's guilt. *Id.*

Considering the evidence collectively, it is painfully clear that the result of the trial would likely have been different had the suppressed evidence been disclosed to the defense. *See Strickler*, 527 U.S. at 280; *Kyles*, 514 U.S. at 436-37. At the very least, the State's failure to turn over this evidence can "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Kyles*, 514 U.S. at 435. Supreme Court precedent compels this conclusion. Therefore, we agree with the district court that habeas relief is warranted.

## II.     The Admission of Bies' Custodial Statements

Bies raises various other trial issues in his petition for habeas relief. For example, he contends that his custodial statements were improperly introduced into evidence and alleges that his inexperienced trial counsel performed deficiently in various ways. Having decided that Bies' *Brady* claim warrants habeas relief, we decline to consider at this time whether the Ohio courts unreasonably applied "clearly established Federal law" such that habeas relief would be appropriate on any of the remaining claims. "Our decision affirming the grant of habeas corpus,

unless there is a new trial, obviates any question as to error in the prior trial." *Jamison*, 291 F.3d at 392 (recognizing that "[w]e avoid unnecessary determination of constitutional questions" and dismissing remaining habeas claims as moot); *see also Smith*, 132 S. Ct. at 631 (declining to consider additional arguments after holding that habeas relief was appropriate on the basis of one of petitioner's *Brady* arguments). Nevertheless, we recognize that the challenged interrogation and surrounding circumstances were highly suspect and extremely inadvisable.

Persons with intellectual disability "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318; *see also Hall*, 134 S. Ct. at 1993. In light of these communicative and social impairments, the Supreme Court has recognized that defendants with intellectual disability are particularly prone to give false confessions. *Id.* (citing *Atkins*, 536 U.S. at 320-21); *see also* Morgan Cloud et al., *Words without Meaning: The Constitution, Confessions, and Mentally Retarded Suspects,* 69 U. Chi. L. Rev. 495, 511-12 (2002) (noting that intellectually disabled individuals are "unusually susceptible to the perceived wishes of authority figures[,]" and have "a generalized desire to please"); Welsh S. White, *What is an Involuntary Confession Now?,* 50 Rutgers L. Rev. 2001, 2044 (1998) (stating that "mentally handicapped suspects are 'especially vulnerable to the pressures of accusatorial interrogation'").

This serious concern could have been effectively eliminated if the detectives had made a few simple yet critical changes in the way that they conducted their investigation. After observing cues indicating Bies' diminished mental capacity, such as his inability to spell "Allen" High School, the detectives should have questioned Bies' ability to knowingly and intelligently waive his *Miranda* rights, and should have utilized appropriate interrogation techniques in order to ensure the admissibility of custodial statements. "When a suspect suffers from some mental incapacity, such as . . . [intellectual disability], and the incapacity is known to interrogating officers, a lesser quantum of coercion is necessary to call a confession into question." *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002) (quotation marks and citation omitted).

The detectives' practice of turning off the tape recorder periodically throughout the questioning—leaving the Court to simply guess what was said off-the-record—makes it

exceedingly difficult to determine what information Bies offered organically and what was "contaminated" by the detectives. *See* Richard A. Leo et. al., *Bringing Reliability Back in: False Confessions and Legal Safeguards in the Twenty-First Century*, 2006 Wis. L. Rev. 479, 521 (2006) (observing that "[a] suspect who did not commit the crime will not possess personal [non-public] knowledge of the crime details unless . . . the police have "contaminated" the suspect through education about the crime scene facts during the interrogation process").

Even without knowledge of the medical reports concerning Bies' diminished mental capacity, the detectives observed behavior over the span of their twenty-four hour interrogation that should have led them to question Bies' mental capacity. Under the circumstances, the officers' uninhibited use of leading questions, off-the-record "fact-feeding," failure to adequately explain Bies' *Miranda* rights, and alleged failure to re-advise Bies of his rights after long breaks in questioning heighten the risk that Bies' confession was false or coerced, and call into question the admissibility of his custodial statements. We have serious doubt that these statements could be admitted at trial without infringing upon Bies' due process rights.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of a conditional writ of habeas corpus on the *Brady* claim, and decline to rule on the remaining claims whose disposition is not necessary in light of the foregoing.