NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0248n.06

Case No. 18-1462

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
May 05, 2020
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA, )

    Plaintiff-Appellee, )

     )

v. )

     )

BRYAN SORRELL, )

    Defendant-Appellant. )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

_____/

Before: MERRITT, SUHRHEINRICH, and SUTTON, Circuit Judges

**MERRITT, Circuit Judge.** Defendant Bryan Sorrell appeals the district court's denial of his motion for a new trial alleging a violation under *Brady v. Maryland*, 373 U.S. 83 (1963), based on newly discovered evidence. In 2015, a jury convicted Sorrell and others of various charges related to their involvement in the Phantom Motorcycle Club based in the Detroit, Michigan, area. Over a year later, the government discovered evidence pre-dating Sorrell's trial from a separate investigation regarding one of its witnesses in this case, Roger "June" Valdes. The evidence indicated that Valdes, who was incarcerated at the time, had told other inmates that he was misleading law enforcement in their investigation of Sorrell's case. We agree with the district court below that the evidence was not material to Sorrell's trial and its absence does not undermine our confidence in the verdict.

**I.**

The Supreme Court in *Strickler v. Greene*, 527 U.S. 263 (1999), stated the following about

*Brady* claims:

> "[T]here is never a real '*Brady*' violation unless the nondisclosure was so serious
> that there is a reasonable probability that the suppressed evidence would have
> produced a different verdict.  There are three components of a true *Brady* violation:
> The evidence at issue must be favorable to the accused, either because it is
> exculpatory, or because it is impeaching; that evidence must have been suppressed
> by the State, either willfully or inadvertently; and prejudice must have ensued."

*Id.* at 281–82.  Because there is not a reasonable probability that the evidence concerning Valdes'

misleading of law enforcement would have produced a different result in Sorrell's trial, we hold

that Sorrell suffered no prejudice and thus affirm the district court.

This case arises out of the Phantom Motorcycle Club's confrontations with rival

motorcycle clubs in the Detroit, Michigan area.[1]  The Phantoms have a hierarchical structure,

including a national president, vice-president, enforcers, and treasurer.  Each chapter also has a

president and vice-president.  Sorrell was a member of the Inkster, Michigan, chapter.  The Detroit

Chapter is the "mother chapter."

The Phantoms pride themselves on being the "baddest" motorcycle club.  One way the

Phantoms establish their dominance is to take the leather vests of members of rival clubs.  These

vests are known as "rags" and are important symbols in motorcycle club culture.

In September 2013, a group of Phantoms, including Sorrell, Carl Miller (the Detroit

Chapter president at the time), Valdes, and a prospect (a prospective member), went on a mission

to steal "rags" from members of another club, the Satan's Sidekicks.  The Phantoms attacked Leon

McGee, a member of the Satan's Sidekicks, outside another rival's clubhouse.  During the incident,

---

[1] These facts are taken from our opinion affirming Sorrell's convictions on direct appeal.  *See United States v. Nicholson*, 716 F. App'x 400, 403–12 (6th Cir. 2017).

Sorrell was stabbed and shot, and McGee was also shot. This and other incidents eventually led to the arrest of Sorrell and other Phantoms.[2]

A federal grand jury charged Sorrell and other Phantoms with various charges. After a six-week trial in March 2015, Sorrell was convicted of RICO conspiracy, 18 U.S.C. § 1962(d); Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(3); Conspiracy to Assault with a Dangerous Weapon in Aid of Racketeering, 18 § U.C.C. § 1959(a)(6); Use and Carry of a Firearm During, and in Relation to, a Crime of Violence, 18 U.S.C. § 924(c); and Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)(5). Sorrell was sentenced to 252 months, and we affirmed Sorrell's convictions on direct appeal. *Nicholson*, 716 F. App'x at 403–412.

Valdes, who was incarcerated at the time of trial, served as a cooperating witness in this case and provided substantial testimony at trial. In December 2016, the case agent, Special Agent Marsh, was given a Report of Investigation dated March 2014. The Report was written by officers who were on the same task force as Agent Marsh, but was from a separate investigation. An Assistant United States Attorney involved in the prosecution received an email regarding the report shortly thereafter. The Report indicated that a Source of Information, an inmate with Valdes, stated that Valdes told other inmates that he was misleading law enforcement in their investigation of this case. The Report stated, in relevant part:

> [The Source] stated that there is a Vicelord [sic] gang member named JUNE. [The Source] stated that JUNE is currently in custody in Milan Federal Prison. JUNE has been bragging to several of the inmates that he has been misleading police by cooperating and telling the police that somebody else was responsible for the homicide he is being charged with. According to JUNE, he actually did fire shots the night of the incident. The victim was shot over a motorcycle club jacket.

---

[2] For a more detailed factual background, see *Nicholson*, 716 F. App'x at 403–12.

On September 1, 2017, Sorrell filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 alleging that the government's failure to disclose the Report violated his rights under *Brady v. Maryland*, 373 U.S. 83 (1963)  The district court denied his motion.

**II.**

When a motion for a new trial alleges a *Brady* violation, we review the district court's denial of the motion under an abuse of discretion standard, but we review the determination of the existence of a *Brady* claim *de novo*.  *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014). We thus give considerable deference to the district court's factual findings and conclusions, but review *de novo* the district court's conclusions about the legal significance of those findings.  *Id.*[3]

The parties do not dispute that Sorrell satisfies the first two requirements of the three-part test from *Strickler*, mentioned above.  Like most alleged *Brady* violations, the parties dispute the third requirement, whether the nondisclosure of that evidence prejudiced Sorrell's trial.  *See Strickler*, 527 U.S. at 281–82.  In determining if prejudice occurred for *Brady* purposes, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The standard requires a showing of more than a "reasonable possibility" of a different result, *Strickler*, 527 U.S. at 291, but "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal."  *Kyles*, 514 U.S. at 434.

---

[3] The government argues that Sorrell forfeited his arguments for the counts concerning the conduct related to the motorcycle club the Hell Lovers, (Counts 1 and 8 of the Third Superseding Indictment), and that, at most, we should apply the plain error standard to those claims.  We do not address this issue because, under either standard, we do not find that Sorrell suffered prejudice.

Sorrell maintains that the Report contradicted Valdes' testimony about the McGee shooting, and would have questioned the thoroughness of the government's investigation and diminished Valdes' credibility.

Valdes' trial testimony is largely consistent with Sorrell's own words in a recorded conversation with Miller. Valdes testified at trial that he, Miller, Sorrell, and the Prospect drove to the Soul Devils' clubhouse, and that others, including Sorrell, were armed, as was typical for a mission like this. They waited in the parking lot for about an hour until McGee exited the clubhouse with his wife, Antoinette. Valdes stated that Sorrell identified McGee as a Satan's Sidekick, and Valdes approached McGee at his SUV while he was opening the passenger's side door for Antoinette. Valdes punched McGee, who was not impacted by Valdes' punch. Sorrell then ran over to assist Valdes, and McGee punched Sorrell about three times, and on the third time, Sorrell fell over. The Prospect and Miller then rushed McGee, who directed Antoinette to get her pistol out from her purse and let the Phantoms "have it." Valdes then ran behind the vehicle while McGee partially entered the driver's side door. Once Valdes was on the passenger's side of the vehicle, he looked inside the vehicle and saw Sorrell pointing a gun inside the vehicle and fire shots. Valdes said he then shot his gun once in the air before it jammed. By the time Valdes tried to shoot his gun once more, everyone had fled the scene.

A couple days later, the Phantoms had a meeting to discuss the event. When Valdes arrived about mid-way through the meeting, Antonio Johnson, the Phantom's leader, was blaming Miller for the failed mission, as the Phantoms did not collect any "rags" and Sorrell got injured, and Miller was blaming Valdes. Valdes stated that, to ease the tension, he told others that he shot McGee in the face. At trial, Valdes said that was not true. Valdes stated that he told others he shot McGee because if he didn't, "something was going to happen to [him] there."

In recorded conversations with Miller, Sorrell told largely the same story. Sorrell stated that McGee was unaffected by Valdes' punch, so he went to assist Valdes, and McGee stabbed Sorrell when he and Valdes were fighting with McGee. Sorrell said to Miller that he grabbed a gun, and that he knew he had a gun in his hand. Sorrell stated, "I'm the one who shot him", referring to McGee, and that he heard another shot. Miller told Sorrell that Valdes was saying that Valdes was the one that shot McGee. Sorrell responded, "[Valdes] probably shot him too. But I know I shot [him]." Later in the conversation, Sorrell stated, "I probably did shoot him in the face[.]" There was also an exchange between Miller and Sorrell about Sorrell giving Miller a gun after the incident. Thus, Valdes' testimony was "consistently corroborated at trial" by Sorrell's own admissions, and the government's case did not rely exclusively on Valdes' testimony such that evidence casting doubt on Valdes' credibility would undermine our confidence in the verdict. *See Dado*, 759 F.3d at 562.

Sorrell also contends that the Report would have influenced the jury's thinking on other counts[4] because the Report would have diminished Valdes' credibility and questioned the thoroughness of the entire investigation. The Report was part of a separate investigation, and among the many witnesses who testified during the six-week trial, the Report could have hardly questioned the thoroughness of the investigation. The cases on which Sorrell relies for this argument, as he points out, all involve the failure to disclose evidence relating to potential alternate suspects. *See Juniper v. Zook*, 876 F.3d 551, 570–71 (4th Cir. 2017); *Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 302, 312 (3d Cir. 2016); *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014). And, as Sorrell concedes, that is absent here.

---

[4] These other counts are Conspiracy to Commit Murder in Aid of Racketeering, Count 8 in the Third Superseding Indictment, and RICO Conspiracy, Count 1 in the Third Superseding Indictment. This conduct relates to the Phantoms' confrontations with another club, the Hell Lovers.

Additionally, Valdes' credibility was questioned on several grounds, including that he was previously dishonest with law enforcement. At trial, Valdes told the jury that he was formerly a Latin King, was a convicted felon, and sold cocaine after completing parole. Valdes also admitted that he had conversations with law enforcement in October 2013 and January 2014, and that he was not truthful in the October conversations. He said that he began to be truthful because of his cooperation agreement with the government, and that the government, as part of the agreement, promised to recommend a reduced sentence from 150–187 months to 75–78 months.

The district court also instructed the jury to take Valdes' testimony with caution. The court told the jury that Valdes had entered a cooperation agreement under which Valdes may receive a reduced sentence in exchange for his cooperation, and that the jury should consider if his testimony was influenced by the government's promise of a reduced sentence. In addition, the court instructed the jury to consider that Valdes was involved in some of the same crimes as Sorrell and the other defendants. Thus, the district court observed Valdes' "testimony and form[ed] a sense of his credibility (or lack thereof)" and instructed the jury to consider his testimony with caution. *See United States v. Heriot*, 496 F.3d 601, 606 (6th Cir. 2007).

In light of all of the above, we cannot say that the absence of the Report undermines our confidence in the verdict. We affirm the district court.