RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GARY HUGHBANKS,

*Petitioner-Appellant,*

*v.*

STUART HUDSON, Warden,

*Respondent-Appellee.*

No. 18-3955

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:07-cv-00111—Michael R. Merz, Magistrate Judge.

Argued:  October 22, 2020

Decided and Filed:  June 21, 2021

Before:  MOORE, CLAY, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  David Paul Williamson, BIESER, GREER & LANDIS, LLP, Dayton, Ohio, for Appellant.  Margaret S. Moore, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  David Paul Williamson, BIESER, GREER & LANDIS, LLP, Dayton, Ohio, Dennis L. Sipe, Marietta, Ohio, for Appellant.  Margaret S. Moore, Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

        MOORE, J., delivered the opinion of the court in which CLAY and GIBBONS, JJ., joined.  GIBBONS, J. (pg. 26), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. Gary Hughbanks, a death-row prisoner in Ohio, appeals the denial of his petition for a writ of habeas corpus by the United States District Court for the Southern District of Ohio. Hughbanks contends that the State withheld material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and he asserts that the Ohio Court of Appeals unreasonably determined that his trial counsel did not offer ineffective assistance at his mitigation hearing. For the reasons set forth below, we **AFFIRM** the decision of the district court denying Hughbanks habeas relief.

## I. BACKGROUND

### A. Factual Background

Because this case does not turn on factual disputes but solely involves issues of law, we present the following account of the facts from the Ohio Supreme Court's decision:

> Around 9:00 p.m. on May 13, 1987, William and Juanita Leeman returned to their home in Springfield Township in Hamilton County, Ohio. Once inside, William Leeman confronted a burglar, who proceeded to kill 55-year-old William and 53-year-old Juanita with a knife.
>
> These murders went unsolved for ten years. In August 1997, Larry Hughbanks, the defendant's brother, and Gary Hughbanks Sr., the defendant's father, informed police that Hughbanks had murdered the Leemans.
>
> Hughbanks was tried and convicted of the aggravated murders of the Leemans and sentenced to death. To establish Hughbanks's guilt, the state introduced a confession, testimony that Hughbanks's [sic] accurately described the layout of the Leeman home and the Leemans' personal property, and two of Hughbanks's knives, which were linked to the murders.
>
> Hughbanks had gone to the Leeman home during the evening of May 13, 1987, to commit burglary. After looking through the windows to ensure that no one was home, Hughbanks broke in through a back window. Hughbanks went to the master bedroom and took William's wallet and jewelry from the dresser.
>
> When the Leemans came into the house, William confronted Hughbanks in a bedroom. Hughbanks attacked William with a knife, stabbed him repeatedly, and then slit his throat. According to Hughbanks's confession, the attack was over in

"a matter of seconds." After Hughbanks slit William's throat, he chased Juanita into the living room, grabbed her, and slit her throat.

Hughbanks washed in the bathroom and left a bloody hand towel in the sink. He then left the house through the back door, ran through the back yard into adjoining woods, and traveled along a creek to a nearby school. Hughbanks was gone by the time police officers arrived.

After being attacked, Juanita stumbled out the front door of her home. While bleeding profusely, she somehow moved from the patio to the driveway, then down the driveway, before collapsing near the street.

At approximately 9:25 p.m. that evening, Police Officer Pat Kemper was driving his patrol car when he saw someone lying on the driveway at the Leemans' house "waving [her] arm in a real slow motion * * * to get attention." Kemper noticed that the person was covered in blood. Upon stopping, Kemper asked, "Who did this to you[?]" Juanita was conscious, but when she started to talk, "blood was gurgling out of her throat, and the whole side of her face just fell open * * *." Juanita died of her injuries at the hospital.

Police officers entered the Leemans' house and found William's body in the master bedroom. There were signs of a violent struggle; part of the bedroom wall was bashed in, a lamp was turned over, and blood was smeared on the wall. There was a pool of blood on the carpet between the bed and the wall and a pool of blood under William's head. The telephone cord had been cut, and open dresser drawers appeared to have been searched.

A "large puddle of blood" on the living room carpet indicated where Juanita had been attacked. A trail of blood leading out the front door, onto the front porch, and down the driveway showed Juanita's line of travel after the attack.

Blood smears on an unlocked back screen door suggested that the killer had left that way. On the day after the murders, a police bloodhound tracked the killer's scent using the hand towel Hughbanks had left in the sink. The bloodhound followed the scent out the back door, down a hill, and into the creek that borders the Leemans' back yard. The bloodhound then traveled along the creek for a quarter of a mile before losing the scent near a neighborhood school.

The police investigation did not uncover any trace evidence, hair fibers, or fingerprints that could identify the killer. Between May 1987 and August 1997, the police checked out "hundreds of leads," but the killer remained unidentified.

During the summer of 1997, Larry Hughbanks told the police that Gary Hughbanks Jr., his brother, had killed the Leemans. Larry told police that Hughbanks was living in Arizona, but that before leaving, Hughbanks had said, "[I] did it, and * * * threw the knife in some woods." Gary Hughbanks Sr., the defendant's father, soon thereafter went to the police station "to talk * * * about his son murdering the Leemans."

In August 1997, Larry and Gary Sr. met with John Jay, an investigator with the Hamilton County Prosecutor's Office, and Mark Piepmeier, an assistant county prosecutor. Larry turned over a survival knife with a ball compass on the end of the handle. Larry said that Hughbanks "had thrown that knife in a wooded area back in the early part of 1988 out in Amelia, Ohio, when they lived in a trailer." Gary Sr. also implicated Hughbanks in the Leeman murders.

Subsequent police interviews of Jerry Shaw, Hughbanks's uncle, and Howard Shaw, Hughbanks's cousin, resulted in additional information implicating Hughbanks as the Leemans' killer. Lisa Leggett, identified as Hughbanks's "ex-common-law wife," provided police with another survival knife with a ball compass on the handle that had belonged to Hughbanks. In May 1987, Leggett and Hughbanks had lived near the Leeman home. According to Leggett, the knife was "left behind by [Hughbanks] when they split."

In September 1997, Tucson, Arizona police arrested Hughbanks. During a police interview on September 9, 1997, Hughbanks denied any involvement in the Leeman murders. Thereafter, Hughbanks remained in police custody in Arizona pending extradition to Ohio.

Several days later, on September 16, 1997, Tucson police detectives interviewed Hughbanks again. Hughbanks admitted breaking into the Leemans' house and said that two accomplices had been with him during the burglary. Later, Hughbanks said that a fourth man might have also been at the scene. Hughbanks admitted confronting William in the bedroom after the Leemans arrived home but stated that an accomplice had stabbed William and cut his throat. Hughbanks stated that he did not know where Juanita had been and said that his accomplice had "probably got her first."

As Hughbanks's interview progressed, Hughbanks acknowledged telling his father, brother, and uncle, "I killed somebody." Hughbanks then said, "I went in to commit a burglary. I got scared. I fought with the guy. * * * And I probably ran after the woman and killed her, too." Hughbanks also admitted that he was by himself when he broke into the home and killed the Leemans. Hughbanks said that he had been "completely surprised" by William and had tried to "get away from him in the bedroom." Hughbanks indicated that he "probably" tried to get away by getting out the window, but said, "I think he pulled me back." Hughbanks stated that he had killed the Leemans with a "military knife," which he had found in an "ammo box" in the Leemans' bedroom closet.

When asked about Juanita's location during her husband's murder, Hughbanks replied, "Probably behind me, watching me, and then after I cut his throat, she took off running out of the house and I went after her." Hughbanks said that he caught her in the living room and added, "I figured I cut her enough that she—she'd bleed to death."

Hughbanks admitted that he had kept the knife with him when he fled the scene. Hughbanks stated that after he had left the Leemans' house, he ran towards the woods and creek behind the house. Hughbanks "got the blood off [himself] in the creek" and then followed the creek to Greener School. Later, Hughbanks threw away the costume jewelry that he had taken.

*State v. Hughbanks*, 792 N.E.2d 1081, 1086–88 (Ohio 2003).

## B. Procedural Background

A jury convicted Hughbanks on all counts and recommended the death penalty. The trial court accepted this recommendation and imposed a death sentence for the aggravated murders and a prison term of ten to twenty-five years for the aggravated burglary. Hughbanks's conviction and sentence were affirmed by both the Ohio Court of Appeals, *State v. Hughbanks*, No. C-980595, 1999 WL 1488933 (Ohio Ct. App. Dec. 3, 1999), and the Ohio Supreme Court, *State v. Hughbanks*, 792 N.E.2d 1081 (Ohio 2003). In July 2000, Hughbanks filed his first petition for post-conviction relief, which the Ohio courts denied. *State v. Hughbanks*, No. C-010372, 2003 WL 131937 (Ohio Ct. App. Jan. 17, 2003); *State v. Hughbanks*, 798 N.E.2d 1093 (Ohio 2003) (table). In June 2003, after the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), Hughbanks petitioned the Ohio courts for post-conviction relief, asserting intellectual disability under *Atkins*, which the courts denied. *State v. Hughbanks*, No. C-070773 (Ohio Ct. App. Sept. 3, 2008) (unreported) R. 167-1 (Suppl. App'x) (Page ID #11453); *State v. Hughbanks*, No. 2008-2014 (Ohio Mar. 25, 2009) (unreported) R. 167-1 (Suppl. App'x) (Page ID #11459). In April 2010, Hughbanks filed a successive petition for post-conviction relief, which the Ohio Court of Appeals dismissed due to lack of jurisdiction. *State v. Hughbanks*, No. C-120351 (Ohio Ct. App. Mar. 6, 2013) (unreported) R. 167-5 (Suppl. App'x) (Page ID #14429).

In February 2007, Hughbanks filed in the district court a petition for a writ of habeas corpus, which the court stayed while Hughbanks exhausted his state-court remedies. In his final amended petition, Hughbanks asserted twenty-two grounds for relief, all of which the district court denied. *Hughbanks v. Hudson*, No. 1:07-cv-111, 2018 WL 9597457 (S.D. Ohio Sept. 7, 2018). The district court also determined that there was no basis to grant a certificate of appealability on any ground. *Id.* at *58. We granted Hughbanks's application for a certificate of appealability on two claims: (1) whether the prosecution withheld material evidence from the

defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and (2) whether trial counsel were ineffective for failing adequately to investigate and present mitigation evidence.

## II.  DISCUSSION

### A.  Standard of Review

We review de novo a district court's denial of a petition for a writ of habeas corpus. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).  Hughbanks filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and thus we apply its provisions to his case.  *Id.*

We review the decision of "the last state court to issue a reasoned opinion on the issue[s]" raised in a habeas petition.  *Id.* at 450 (quoting *Payne v. Bell*, 418 F.3d 644, 660 (6th Cir. 2005)). Under AEDPA, when a state court has adjudicated the merits of a claim, we may grant a writ of habeas corpus if (1) the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).  As discussed in more detail in Part II.C, the Ohio Court of Appeals in 2003 was the last state court to issue a reasoned opinion on Hughbanks's ineffective-assistance-of-counsel claim, and it adjudicated the claim on the merits.  However, when a state court has not adjudicated the merits of a claim, the requirements of § 2254(d) do not apply. *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006).  For reasons that we discuss at greater length in Part II.B, the last Ohio court to issue a reasoned opinion discussing Hughbanks's *Brady* claim did not reach the merits of the claim, and therefore "AEDPA's deferential standard of review does not apply" to Hughbanks's *Brady* claim.  *Id*.

### B.  *Brady* Claim

#### 1.  Procedural Default

On appeal, Hughbanks limits his *Brady* claim to the grounds presented in his second state post-conviction application, relying exclusively on the evidence he obtained during federal

discovery.  Appellant Br. at 35 & n.4.  The last state court to issue a reasoned opinion on Hughbanks's *Brady* claim from his second post-conviction application was the Ohio Court of Appeals in 2013.  *State v. Hughbanks*, No. C-120351 (Ohio Ct. App. Mar. 6, 2013) (unreported) R. 167-5 (Suppl. App'x) (Page ID #14429).  The Ohio Court of Appeals did not reach the merits of the claim.  Instead, the Ohio Court of Appeals held that the trial court lacked jurisdiction to consider Hughbanks's petition because Hughbanks did not satisfy the time requirements of Ohio Revised Code § 2953.21(A)(2) or the requirements set out in Ohio Revised Code § 2953.23 for a successive post-conviction petition.  *Id.* at 2–3 (Page ID #14430–31); *see Barton v. Warden*, 786 F.3d 450, 462 (6th Cir. 2015) (per curiam) (holding that a state court's explicit application of a procedural rule to bar the adjudication of a claim on the merits counts as a "last reasoned opinion").  In applying these state-law procedural bars, the Ohio Court of Appeals did not adjudicate Hughbanks's *Brady* claim on the merits; thus, "the limitations imposed by § 2254(d) do not apply, and we review the claim *de novo*."  *Bies v. Sheldon*, 775 F.3d 386, 396 & n.7 (6th Cir. 2014) (recognizing that our court has held that Ohio courts' use of Ohio Revised Code § 2953.23 to bar a petitioner's claim constitutes procedural default); *White v. Warden*, 940 F.3d 270, 275 (6th Cir. 2019) (holding the same for Ohio Revised Code § 2953.21(A)(2)).

Because the Ohio Court of Appeals applied a state-law procedural bar to reject Hughbanks's *Brady* claim, we consider his claim to be procedurally defaulted.  *Bies*, 775 F.3d at 396.  Generally, "[u]nexcused procedural default precludes federal habeas review.  However, federal courts can excuse procedural default upon a showing of either cause and prejudice or a fundamental miscarriage of justice."  *Id.* (internal citations omitted).  When considering procedurally defaulted *Brady* claims, the Supreme Court has held that two of the three elements of an alleged *Brady* violation, whether the evidence was suppressed by the State and whether such suppressed evidence was material, constitute the required cause and prejudice to excuse procedural default.  *Strickler v. Greene*, 527 U.S. 263, 282 (1999).  Thus, if Hughbanks can demonstrate a meritorious *Brady* violation, he will have also made the requisite showing of cause and prejudice, allowing us to grant habeas relief.  Accordingly, we proceed to an analysis of his claim on the merits.

**2. Merits**

A *Brady* claim has three elements: (1) "the evidence in question [is] favorable," (2) "the state suppressed the relevant evidence, either purposefully or inadvertently," and (3) "the state's actions resulted in prejudice." *Thomas v. Westbrooks*, 849 F.3d 659, 663 (6th Cir. 2017) (alteration in original) (quoting *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008)). Favorable evidence is evidence that is "exculpatory" or "impeaching." *Bies*, 775 F.3d at 397 (quoting *Strickler*, 527 U.S. at 282). The third prong, prejudice, "is sometimes referred to as the 'materiality' requirement." *Id.* Importantly, a court must consider "the materiality of withheld evidence . . . only by evaluating the evidence collectively," *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003) (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)), not "item by item," *Spirko v. Mitchell*, 368 F.3d 603, 609 (6th Cir. 2004) (citing *Kyles*, 514 U.S. at 436).

Hughbanks contends that the State suppressed six categories of material evidence: (1) information identifying other suspects; (2) documentation concerning the actions of Burt Leeman, one of the victims' sons, that implicated Burt in the murders; (3) the absence of trace evidence at the scene of the crime that implicated Hughbanks; (4) eyewitness statements that did not match a description of Hughbanks; (5) evidence that impeached the prosecution's theory of the case; and (6) evidence that impeached the prosecution's witnesses. Appellant Br. at 37.

**a. Favorable and Suppressed Evidence**

**i. Evidence of Other Suspects**

Hughbanks first argues that the State suppressed evidence that identified other suspects, including Douglas Hayes, George Wambsganz, Stacy Grisby, Michael Hensley, and several juveniles. R. 213 (Third Am. Pet. at 58–60) (Page ID #15966–68); Appellant Br. at 37, 44–47. Hughbanks provides evidence gathered during federal habeas discovery that local law enforcement had detailing the investigation into these suspects. Appellant Br. at 44–47. The Warden appears to concede that this evidence was suppressed, arguing instead that the evidence was not favorable. Appellee Br. at 22—24. Specifically, the Warden argues that the State was required to disclose only "legitimate suspects." *Id.* at 24. Apart from the evidence concerning Douglas Hayes, we agree that the Warden has the better of the argument.

"Prosecutors are not necessarily required to disclose every stray lead and anonymous tip, but they must disclose the existence of 'legitimate suspects.'" *Gumm v. Mitchell*, 775 F.3d 345, 364 (6th Cir. 2014) (quoting *D'Ambrosio v. Bagley*, 527 F.3d 489, 499 (6th Cir. 2008)). In determining what constitutes a "legitimate suspect," we generally look to see what evidence substantiates that the suspects may have been involved in the crime. *Id.* at 366; *see also Jamison v. Collins*, 291 F.3d 380, 391–92 (6th Cir. 2002) (noting that enough relevant factors consistent with the details of the crime matched a second suspect such that information concerning the suspect should have been disclosed). Only the information the police had pertaining to Hayes meets this standard. During the investigation, a jailhouse informant named Thomas Edward Buster told Detective that Hayes admitted that he committed a murder with details that matched the Leemans' murder. R. 167-5 (Buster Polygraph Results at 1–2) (Page ID #14070–71). A polygraph test determined that Buster was being truthful when he told police about the confession. *Id.* at 2 (Page ID #14071); *see Gumm*, 775 F.3d at 364 (concluding that a suspect who was reported to have confessed to committing the crime to be a legitimate suspect who should be disclosed). However, for the other four leads, Hughbanks has not demonstrated that the police withheld any evidence showing a sufficient connection to the details of the crime. None of the other suspects confessed to killing the Leemans, were implicated by trace evidence, or were linked to any activities that were consistent with the Leemans' murder. *See* R. 167-5 (Investigative Materials) (Page ID #14041–46, 14058–59, 14128, 14141). Thus, we will consider only the alleged Hayes confession when assessing the materiality of this category of evidence.

### ii. Evidence Concerning Burt Leeman

Hughbanks contends that the State suppressed evidence that identified Burt Leeman, one of the victims' three sons, as a suspect, including that Burt was suspected of credit-card fraud related to one of his father's cards after his murder, that the sons would receive $200,000 each upon the death of their parents, and that Burt's conduct and demeanor was suspicious during the investigation. R. 213 (Third Am. Pet. at 58–59) (Page ID #15966–67); Appellant Br. at 47–52. Hughbanks provides the following evidence to support his claim: a report regarding Burt's involvement, R. 167-5 (Burt Leeman Report) (Page ID #14061–64); an investigative report

provided to the FBI, R. 167-5 (FBI Investigative Report) (Page ID #14128–31); an analysis by the FBI of the crime, R. 167-5 (FBI VICAP Report) (Page ID #14135–39), and credit-card history of William's card, R. 167-5 (Leeman Credit History) (Page #14132–34). It is uncontested that this evidence was not provided to the defense. Evidence implicating a different suspect is clearly favorable to Hughbanks.

The Warden also argues that much of this evidence was reported in the local newspaper and thus cannot be considered suppressed *Brady* material. Appellee Br. at 32. True enough, "there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question or if the information was available to him from another source." *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). However, under the circumstances here, the newspaper articles cannot have put Hughbanks's attorneys on notice of law enforcement's serious interest in Burt as a suspect, both for the murders of his parents and the credit-card fraud, or that the FBI had provided a different theory of the case supporting Burt's inclusion as a suspect. One newspaper article stated that "Burt Leeman said police told [the brothers] early in the investigation that they suspected family members were involved in the slayings because of the viciousness of the killings. Police had consulted a psychologist who expounded on the theory of the family's involvement." R. 166-18 (Newspaper Articles at 9) (Page ID #8964). It also noted that the brothers had taken polygraph tests. *Id.* A second article summarized the same information. *Id.* at 14 (Page ID #8969). The newspaper reports point to the fact that the police considered Burt to be a suspect but did not give any indication that the police believed that Burt was a serious suspect, that the credit-card fraud investigation existed, or that records existed supporting these facts. It is too much to imply from these articles, none of which include official police-department comments, that the defense would have had the essential facts necessary to take advantage of the reports concerning Burt's involvement and the investigation materials from the credit-card fraud. *See Strickler*, 527 U.S. at 284–85 (holding that a newspaper article detailing that a witness had been interviewed by the police did not suffice to put a defendant's lawyer on notice that records and evidence concerning the witness existed and had been suppressed).

The Warden also argues that the FBI VICAP report is not exculpatory evidence because it is "the FBI's opinion." Appellee Br. at 29. The Supreme Court has recognized that a prosecutor need not disclose "preliminary, challenged, or speculative information." *United States v. Agurs*, 427 U.S. 97, 109 & n.16 (1976) (quoting *Giles v. Maryland*, 386 U.S. 66, 98 (1967) (Fortas, J., concurring in the judgment)); *see also Woods v. Smith*, 660 F. App'x 414, 435 (6th Cir. 2016) (holding that it was not unreasonable to consider an officer's conclusion as a preliminary suspicion when the officer "provided little information about the basis of his 'conclusion' and did not explain the extent to which it was shared by others in [the department]"). But we fail to see how a routinely prepared FBI crime-analysis report, compiled after reviewing relevant evidence, and requested and relied upon by investigating police officers, falls within that category. *See* R. 167-5 (FBI VICAP Report) (Page ID #14091, 14135). Accordingly, the evidence that Hughbanks put forward concerning Burt Leeman as a suspect will also be considered in our materiality analysis.

### iii. Trace Evidence

Hughbanks avers that the State suppressed evidence of the results of palm-print and fingerprint analysis. Appellant Br. at 52–54. Specifically, he argues that the suppressed evidence notes that some of the prints were suitable for comparison purposes. Reply Br. at 28. The State disclosed that prints were taken from the crime scene and "[o]nly a few were suitable for comparison. None were matched to the defendant or anyone else." R. 166-2 (State Resp. to Def.'s Demand for Disc. at 2) (Page ID #3949). Hughbanks provides no explanation as to why the list of individuals who also had their prints compared provides additional support to the exonerating results of his print comparison. Consequently, we hold that this evidence is not *Brady* material.

### iv. Eyewitness Statements

Hughbanks points to evidence of favorable eyewitness statements and two composite drawings, *i.e.*, those that Hughbanks contends do not identify him or aid in identifying him as the perpetrator. Appellant Br. at 54–57. However, one of the sketches that Hughbanks relies on, R. 167-5 (Composite Questionnaire) (Page ID #14075–76), was published in a newspaper article, R.

166-18 (Newspaper Articles at 5) (Page ID #8960), and thus is not *Brady* material. The witness statements and remaining sketch all describe individuals who do not match Hughbanks's physical description but who were seen in the immediate area surrounding the Leeman residence during the timeframe of the murders. The Warden does not contest that these statements and sketches were suppressed or favorable.

### v.  Evidence Undermining the State's Theory of the Case

Hughbanks relies on the FBI VICAP Report, the Burt Leeman Report, and the investigative materials as suppressed evidence that undermined the prosecution's theory of the case, specifically claiming that these items show that (1) the victims knew their assailant, (2) the assailant did not enter the victims' residence to commit burglary, and (3) the victims did not surprise the assailant by returning home after the assailant had entered their home. Appellant Br. at 57–64. As discussed earlier, *see supra* Section II.B.2.a.ii, the newspaper articles did not put Hughbanks on notice of the breadth and depth of evidence the police had that contradicted the prosecutor's theory that the murderer did not know the Leemans, intended to burglarize their residence, and was surprised by the Leemans upon their return to the residence. For example, although the newspapers reported that the house was left undisturbed, the FBI VICAP report noted that "the victims [sic] jewelry drawers were pulled out" in a manner that suggested purposeful "staging." R. 167-5 (FBI VICAP Report) (Page ID #14137). This type of evidence is much more detailed and cannot be ascertained from a simple report that the house was not ransacked. Thus, we will also consider the materiality of this evidence.

### vi.  Impeachment of the State's Witnesses

Finally, Hughbanks points to evidence that impeached two of the prosecution's witnesses—Leonard Leeman, another one of the victims' sons, and Detective Kemper. Appellant Br. at 64–69. Regarding Leonard, Hughbanks points to the investigative materials. Appellant Br. at 65. For Detective Kemper, Hughbanks points to the fingerprint analysis and the FBI VICAP Report. *Id.* at 68–69. However, none of the evidence to which Hughbanks points was suppressed and favorable. As to Leonard, the only possible *Brady* material is the investigative material identifying a wallet as the sole missing property, which would simply

render Leonard's testimony about his mother's jewelry irrelevant, but was completely consistent with Leonard's testimony that only his father's wallet was stolen. *See* R. 163-13 (Leonard Test.) (Page ID #3176–77); R. 167-5 (Investigative Materials at 3) (Page ID #13998). Hughbanks argues that the suppressed evidence would have permitted him to impeach Leonard's testimony as to the layout of his parents' house and property that was stolen. Appellant Br. at 65–66. However, Hughbanks does not point to a single impeaching reference to the layout of the Leeman home in the investigative materials.

The same is true of Hughbanks's discussion of Detective Kemper's testimony. Hughbanks focuses on Detective Kemper's testimony that Hughbanks's confession was consistent with details of the crime, including the layout of the house. Appellant Br. at 67–69. But there is no reference to the layout of the Leeman home in either the investigative materials or the FBI VICAP Report. Instead, Hughbanks relies on his own confession or trial testimony to highlight any inaccuracies in Detective Kemper's testimony. *Id.* at 67–69. Hughbanks's confession and the trial testimony are not *Brady* material. Finally, Hughbanks argues that he could impeach Detective Kemper's testimony that no trace evidence was recovered with the palm-print and fingerprint analysis. *Id.* at 67. As stated above, however, this evidence was not suppressed, and Hughbanks could have impeached Detective Kemper with the State's disclosures.

### b. Materiality of the Undisclosed Evidence

A finding of a *Brady* violation requires that suppressed, favorable evidence must be material, *i.e.*, that "the omitted evidence creates a reasonable doubt that did not otherwise exist." *Agurs*, 427 U.S. at 112. Or, put differently, "there [must be] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The Supreme Court has clarified that "[t]he question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. Therefore, if "the favorable evidence could reasonably be taken to put the whole case in such a

different light as to undermine confidence in the verdict," the evidence is material and thus satisfies *Brady*. *Strickler*, 527 U.S. at 290 (quoting *Kyles*, 514 U.S. at 435).

At the outset, it is important to note what a materiality analysis is not. First, "it is not a sufficiency of evidence test," meaning that "[a] defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434. The district court erroneously undertook a sufficiency analysis. It listed the salutary points of Hughbanks's confession and then concluded that his "confession, as discussed before, was admitted at trial, and the statements therein *constituted more than enough evidence for the jury to conclude beyond a reasonable doubt that Petitioner had committed the burglary and murders*, even if he had contested guilt at trial." R. 242 (District Court Op. at 83–84) (Page ID #16612–13) (emphasis added). That is not the test.

Second, materiality refers to the effect of the suppressed evidence "collectively, not item by item." *Kyles*, 514 U.S at 436. The district court's and the Warden's analyses fail to consider the effect of the suppressed, favorable evidence collectively.

With those admonitions in mind, we assess the cumulative materiality of Hayes's confession, Burt's status as a suspect in the murder and in credit-card fraud, favorable eyewitness accounts, the unpublished composite sketch, and the evidence from the investigative materials and the FBI VICAP Report undermining the prosecution's theory of the case. We evaluate these omissions "in the context of the entire record." *Agurs*, 427 U.S. at 112. In doing so, "we 'undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial.'" *Bies*, 775 F.3d at 399 (quoting *Boss v. Pierce*, 263 F.3d 734, 745 (7th Cir. 2001)).

We can immediately remove one of these pieces of evidence from our review: Hayes's confession. "[E]vidence that could have 'no direct effect on the outcome of trial' cannot be considered *Brady* material." *Barton*, 786 F.3d at 465 (quoting *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995)). But "inadmissible material might nonetheless be considered 'material under *Brady* if it would "lead directly" to admissible evidence.'" *Id.* (quoting *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 n.3 (6th Cir. 2012)). Here Hughbanks has made no such showing regarding

Buster's inadmissible polygraph examination and hearsay statements of Hayes's confession. Although Ohio Rule of Evidence 804(B)(3) permits an unavailable declarant's statement to be admitted when it is a statement against interest, the statement must be accompanied by "corroborating circumstances [which] clearly indicate the trustworthiness of the statement." Hughbanks points to no such corroborating circumstances such as a spontaneous confession occurring shortly after a crime or any other additional evidence implicating Hayes in the murder. *See Gumm*, 775 F.3d at 369. Accordingly, Hayes's confession cannot be considered material under *Brady*. *See Wood*, 516 U.S. at 6 (holding that an appellate court must point to specific admissible evidence that could be utilized, otherwise the conclusion that the disclosed inadmissible evidence might have led to some additional evidence "is based on mere speculation" and is not enough to sustain *Brady* materiality).

Hughbanks offers a conclusory assertion that trial counsel, armed with the remaining suppressed favorable evidence, could have "constructed a 'plausible alternative narrative of the crime and raised reasonable doubt in the minds of the jurors.'" Appellant Br. at 94 (quoting *Bies*, 775 F.3d at 400). Notably in *Bies*, this court was able to construct a compelling alternative narrative based on the suppressed evidence raised by the defendant. *Bies*, 775 F.3d at 399–401 ("Considering the quality and quantity of the evidence that the State failed to disclose in this case, the potential for that evidence to have affected the outcome of Bies' trial is inescapable."). Hughbanks fails to make a similar showing.

The strength of the undisclosed evidence in Hughbanks's case is far weaker, and its nature is much less compelling. Although the investigative reports and the FBI VICAP report marked Burt as a suspect for taking his father's credit cards, the reports at best support considering the potential credit-card fraud as being tangentially related to the murder. Crucially, there was no evidence of Burt, or anyone connected to Burt, physically having the credit cards. Nor was there ever any eyewitness statement, confession, or trace evidence implicating Burt, or any other family member, in the murders. The FBI VICAP and investigative reports' assessments of the evidence in part undermine the prosecution's theory of the case, but at the same time the FBI VICAP report supports the prosecution's theory that Hughbanks committed the murders. The report concluded that the offender was most likely a young White male living

in the area, who encountered a "significant stressor prior to the assault," was "known to have an explosive temper," was lacking "interpersonal skills," likely has displayed anger against his spouse, and "may be known to possess the knife used in the assault."  R. 167-5 (FBI VICAP Report) (Page ID #14138).  The Warden aptly points out that all these descriptors apply to Hughbanks.  Appellee Br. 28–29.  Additionally, neither the eyewitness statements, the composite sketch, nor the FBI VICAP report ever led to a positive identification of any alternative suspect or steered the police to a valuable lead that they failed to pursue.  In sum, the amount of undisclosed evidence was slight as opposed to voluminous, did not significantly weaken the case against Hughbanks, and did not reveal that the police conducted a "shoddy" investigation that could "lessen the credibility of the State's case against [Hughbanks]."  *Bies*, 775 F.3d at 401 (quoting *Kyles*, 514 U.S. at 442 n.13).

The State's case at trial came down to Hughbanks's confession to the police and testimony from Detective Kemper and John Jay, an investigator for the State, that Hughbanks confessed to his father and brother, as well as to other people.  Our court has consistently held that "a confession 'is strong evidence of [] guilt.'"  *Gumm*, 775 F.3d at 371 (alteration in original) (quoting *Harbison v. Bell*, 408 F.3d 823, 824 (6th Cir. 2005)).  Nonetheless, we have also found that "there are numerous reasons why a jury [might] discount[] Petitioner's statements to the police" when conducting a *Brady* materiality analysis.  *Id*.

Hughbanks's confession presents at least two of those reasons.  First, a careful review of the recording of Hughbanks's transcript shows the detectives consistently correcting Hughbanks when he offered details of the crime.  *See Bies*, 775 F.3d at 402–03 (finding that a confession was "far from overwhelming evidence" of a defendant's guilt in part because detectives asked leading questions and supplied him with the facts); *see, e.g.*, R. 193-1 (Hughbanks Confession at 89–91, 160) (Page ID #15545–47, 15617) (stating that he did not inflict any of the wounds on the Leemans, then stating that he did so with a screwdriver while an accomplice wounded the victims with a pocketknife, but ultimately stating that he murdered the Leemans by himself).  Hughbanks's statements during the confession also demonstrate a diminished mental capacity.  *See Gumm*, 775 F.3d at 371.  Throughout his confession, Hughbanks references hallucinations, R. 193-1 (Hughbanks Confession at 123–24) (Page ID #15579–80); that he has psychiatric

problems, *id.* at 125–26 (Page ID #15581–82); and that he was not sure he had committed the murders or whether he had made up the events in his mind, *id.* at 125–26, 129 (Page ID #15581–82, 15585). The circumstances surrounding Hughbanks's statements to police raise a question of whether Hughbanks had the capacity to understand what was happening to him and challenge the legitimacy of his statements. *See Bies*, 775 F.3d at 403.

We find concerning the shortcomings tainting Hughbanks's confession. But the suppressed, favorable evidence does not present a significant challenge to the prosecution's theory of the case or lead to a reasonable probability that a jury would have found Hughbanks's multiple confessions unreliable. In *Bies* and *Gumm*, we held that a defendant's confession did not bar us from concluding that the disclosed evidence put the whole case in such a different light that the verdict was no longer worthy of confidence when there were "numerous reasons why a jury would have discounted [the defendant's] alleged statements to the police." *Bies*, 775 F.3d at 402; *Gumm*, 775 F.3d at 371. In doing so, we emphasized that the suppressed evidence allowed the defendant to construct a compelling alternative theory of the crime, complete with eyewitness testimony implicating another suspect and a confession by that same suspect. *Bies*, 775 F.3d at 402–403; *Gumm*, 775 F.3d at 371, 373. Here the suppressed evidence falls short of mounting a plausible counter-narrative and offers only tenuous connections at best to other suspects. Defense counsel might have been able to craft a story suggesting that another person committed the crime, but they would not have been able to produce a name or description of an alternate suspect that any of the undisclosed evidence could corroborate. Moreover, as discussed above, key parts of the suppressed evidence support the State's theory rather than undermine it. Given the relatively weak exculpatory nature of the undisclosed evidence, despite our concerns regarding Hughbanks's confession, we cannot conclude that the State's failure to disclose the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; s*ee Bies*, 775 F.3d at 399 (assessing materiality in light of the disclosed evidence and the evidence presented by the State). Thus, we affirm the district court's conclusion that the State's failure to disclose favorable evidence did not prejudice Hughbanks. Consequently, we hold that Hughbanks has not overcome procedural default for his *Brady* claim, rendering us unable to grant habeas relief on the basis of this claim.

## C. Ineffective-Assistance-of-Counsel Claim[1]

### 1. *Strickland* and AEDPA Deference

Hughbanks contends that trial counsel provided constitutionally deficient assistance by failing adequately to investigate, prepare, and present mitigation evidence during the penalty phase of trial. Under *Strickland v. Washington*, Hughbanks received ineffective assistance of counsel if his counsel's performance was constitutionally deficient and Hughbanks was prejudiced as a result. 466 U.S. 668, 687 (1984). But AEDPA adds another layer to our review if a state court adjudicated a *Strickland* claim on the merits. Under § 2254(d)(1), we may grant relief only if the state court's merits decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." The Supreme Court has warned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Thus, "[t]he combined effect of *Strickland* and § 2254(d) is doubly deferential review. Put differently, '[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Foust v. Hook*, 655 F.3d 524, 533–34 (6th Cir. 2011) (internal quotations and citations omitted) (quoting *Harrington*, 562 U.S. at 105).

In this case, Hughbanks's first state post-conviction petition alleged several instances of trial counsel ineffectiveness that mirror his claims in his amended federal habeas petition. R. 166-16 (First Post-Conviction Pet. at 33–35, 49–63, 68–69) (Page ID #8224–25, 8240–54, 8259–60); R. 213 (Third Amended Pet. at 92–96) (Page ID #16000–04). The state courts considered Hughbanks's claim of ineffective assistance on its merits. The Ohio Court of Appeals's decision in 2003 was the last reasoned decision of the Ohio courts assessing these claims. That court found that Hughbanks's "counsel presented the case in mitigation competently in view of the facts available to them" and that "[n]othing in the record . . . or in the evidentiary material

---

[1]Hughbanks also asserts that the Ohio Court of Appeals made unreasonable factual determinations under § 2254(d)(2) when it assessed his ineffective-assistance-of-counsel claim. Appellant Br. at 147–48. But the "determinations" Hughbanks takes issue with are not factual determinations as the Supreme Court has defined them but instead are complaints about the court's legal analysis. *See Thompson v. Keohane*, 516 U.S. 99, 109–10 (1995) (holding that factual determinations consist of "basic, primary, or historical facts" (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963))). Thus, his § 2254(d)(2) argument is without merit.

offered in support of these claims presents a reasonable probability that, but for the alleged omissions of counsel, the result of the penalty phase of Hughbanks's trial would have been different." *Hughbanks*, 2003 WL 131937, at *12–13. We therefore afford appropriate deference to the Ohio Court of Appeals's decision on both prongs of the *Strickland* test.

**2. Merits**

Counsel's performance is deficient if it "fell below an objective standard of reasonableness," which means "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. We ascertain reasonableness by looking to the "prevailing professional norms." *Id.* at 688. "Thus, to provide professionally competent assistance in Ohio capital cases, defense counsel must conduct a reasonably thorough investigation into all possible mitigation evidence that would present a sympathetic picture of the defendant's family, social, and psychological background." *Jells v. Mitchell*, 538 F.3d 478, 495–96 (6th Cir. 2008); *see also Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (noting that, according to ABA standards for capital defense work, "among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences").[2] And we define counsel's duty to investigate as "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.

Outside of the deference we owe to the Ohio Court of Appeals's decision, the Supreme Court also has instructed that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Thus, we must "evaluate the conduct from counsel's perspective at the time" and operate under "a strong presumption that counsel's conduct . . . under the circumstances . . . 'might be considered sound trial strategy.'" *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Hughbanks alleges that counsel was deficient by failing (1) to

---

[2]Although *Wiggins* postdates the Ohio Court of Appeals's decision in this case, we have held that *Wiggins* "did not rest on 'new law' but instead 'applied the same "clearly established" precedent of *Strickland*.'" *Johnson v. Bagley*, 544 F.3d 592, 599 (6th Cir. 2008) (quoting *Wiggins*, 539 U.S. at 522).

interview mitigation witnesses; (2) to investigate and present evidence of his mental illness; (3) to retain a competent mental-health expert; and (4) to present relevant evidence regarding Hughbanks's childhood. We address each act or omission in turn. *Id.* at 690.

Hughbanks points to two potential mitigation witnesses whom counsel failed to interview: his father and brother. But Hughbanks ignores the obvious strategic reason for why his counsel did not interview them. Hughbanks's father and brother were the two informants who drew the police's attention to Hughbanks as a suspect in the Leemans' murder. Both informed the police that Hughbanks committed the crime. *Hughbanks*, 792 N.E.2d at 1086. Furthermore, counsel's failure to interview them did not result in the absence of any family member offering mitigating evidence on Hughbanks's behalf. Hughbanks's mother, Evangeline Hughbanks; uncle, Larry Kramer; and sister, Larketa Hughbanks, testified about Hughbanks's struggles with mental health, the abuse Hughbanks suffered from his father, his father's substance abuse and mental illness, and the abusive relationship between his mother and father, as well as other aspects of Hughbanks's troubled childhood. *See, e.g.*, R. 163-16 (Kramer Test., Mitigation Hr'g Tr.) (Page ID #3592, 3594–97, 3600, 3608); R. 163-16 (Larketa Test., Mitigation Hr'g Tr.) (Page ID #3613–19, 3627–31); R. 163-16 (Evangeline Test., Mitigation Hr'g Tr.) (Page ID #3640–42, 3645–48, 3650–56). Under these circumstances, counsel's decision not to investigate Hughbanks's remaining two immediate family members falls within the scope of reasonable trial strategy.

Hughbanks also contends that his counsel was deficient by failing to present evidence that he suffered from bi-polar disorder, substance abuse, and other mental illnesses at the time of the offense. In fact, counsel had two mental-health experts, Dr. Saqi Raju and Dr. Bernard De Silva, testify at the mitigation phase to their treatment and diagnoses of Hughbanks, which included diagnoses of bi-polar disorder, depression, and substance abuse. R. 163-15 (Raju Test., Mitigation Hr'g Tr.) (Page ID #3436, 3439–43, 3453, 3456); R. 163-15 (De Silva Test., Mitigation Hr'g Tr.) (Page ID #3501–02, 3504). Dr. De Silva, who treated Hughbanks since the age of fifteen, explicitly contested the finding of the prosecution's expert, Dr. Nancy Schmidtgoessling, that Hughbanks did not suffer from any mental illness at the time of the offense. R. 163-15 (De Silva Test., Mitigation Hr'g Tr.) (Page ID #3501–02, 3556–58). Dr.

De Silva testified that Hughbanks often had psychotic episodes throughout the timeframe surrounding the murders and that Hughbanks suffered from significant mental illness that would have affected his ability to make judgments, including during social interactions. *Id.* (Page ID #3575–76). To support his claim of ineffectiveness, Hughbanks submitted the affidavit of Dr. Robert Smith, a clinical psychologist, who diagnosed Hughbanks as suffering from PTSD as well as bi-polar disorder and substance abuse at the time of the offense. R. 166-20 (Smith Aff. at 3–4) (Page ID #9285–86). However, this disagreement in diagnoses is not sufficient to render counsel's performance deficient. Dr. Smith relied on evidence known to Dr. De Silva to come to his conclusion that Hughbanks suffered from PTSD. *Id.* at 7–8 (Page ID #9289–90). "[M]ere disagreement between experts" does not serve as an appropriate basis upon which to grant habeas relief. *Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000); *McGuire v. Warden*, 738 F.3d 741, 758 (6th Cir. 2013). Because Hughbanks presents "no evidence that [Dr. De Silva] was incompetent, or that [Hughbanks's] lawyers had any reason to question [Dr. De Silva's] professional qualifications," it was objectively reasonable for Hughbanks's counsel to rely on Dr. De Silva's diagnosis of Hughbanks's mental illnesses. *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001).

For similar reasons, we find unpersuasive Hughbanks's argument that his counsel should have used a clinical psychologist to present Hughbanks's mental health and social background. Dr. Raju treated Hughbanks twice in 1986, less than a year before the murders. R. 163-15 (Raju Test., Mitigation Hr'g Tr.) (Page ID #3452). Dr. De Silva treated Hughbanks over the course of years and evaluated Hughbanks's medical records up the time of the murders in 1987. R. 163-15 (De Silva Test., Mitigation Hr'g Tr.) (Page ID #3490, 3519, 3575–76). Both presented crucial mitigation evidence concerning Hughbanks's mental illness, substance abuse, and troubled family background, including the physical and emotional abuse inflicted on Hughbanks by his parents. The testimony of Hughbanks's family members supplemented the doctors' presentations. The addition of a clinical psychologist might have been helpful to Hughbanks's mitigation team. But considering all the evidence that was presented, counsel's decision to rely on competent mental-health experts who were familiar with Hughbanks and treated him close to the time of the murders does not fall outside the ambit of reasonable trial strategy. *See Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993) (holding that it is reasonable for an attorney to

rely on a competent and reputable professional to evaluate medical records and to formulate judgments necessary to trial preparation).

Hughbanks's final challenge—counsel's failure to present relevant evidence concerning Hughbanks's childhood—has the most merit. Hughbanks asserts that two significant omissions reveal counsel's objectively unreasonable performance. First, Hughbanks notes that counsel did not put forward evidence demonstrating his mother's parental failures, such as her own mental health struggles and substance abuse. But the record belies this contention as Hughbanks's uncle testified that Hughbanks's mother suffered from depression, R. 163-16 (Kramer Test., Mitigation Hr'g Tr.) (Page ID #3600), and Hughbanks's mother and Dr. De Silva discussed how his parents' abusive relationship affected Hughbanks, R. 163-15 (De Silva Test., Mitigation Hr'g Tr.) (Page ID #3499, 3516, 3523); R. 163-16 (Evangeline Test., Mitigation Hr'g Tr.) (Page ID #3640–42, 3651). Both Hughbanks's mother and Dr. De Silva also highlighted an incident where his mother struck Hughbanks in the face. R. 163-15 (De Silva Test., Mitigation Hr'g Tr.) (Page ID #3523); R. 163-16 (Evangeline Test., Mitigation Hr'g Tr.) (Page ID #3666). Hughbanks's mother admitted that she could be "too hard" when disciplining her children. R. 163-16 (Evangeline Test., Mitigation Hr'g Tr.) (Page ID #3662–63). Given all the evidence counsel discovered and presented from Hughbanks's relatives and treating psychiatrist, counsel's decision not to investigate and present additional evidence concerning Hughbanks's mother fell "within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699.

Second, Hughbanks faults his counsel for failing to present evidence that Hughbanks suffered from two very serious episodes of sexual abuse. A cousin of Hughbanks molested him repeatedly for an entire summer, when Hughbanks was seven years old. R. 166-20 (Smith Aff. at 8) (Page ID #9290). An unknown assailant abducted Hughbanks and raped him, when he was fifteen. *Id.* According to Dr. Smith, Hughbanks disclosed the sexual abuse by his cousin to Hughbanks's mother and reported the rape to Dr. De Silva. *Id.* Dr. Smith discussed these incidents, in tandem with the abuse perpetuated against Hughbanks by his father, as the underlying traumatic events that supported his diagnosis that Hughbanks suffered from PTSD at the time of the offense. *Id.* at 7–8 (Page ID #9289–90). Dr. Smith noted that

Dr. Schmidtgoessling's report evaluating Hughbanks's mental health, as well as Hughbanks's medical records, documented these traumatic events. *Id.* at 8 (Page ID #9290).

Counsel's failure to present this evidence is concerning. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). But this is not a case where counsel neglected to investigate adequately a defendant's family, social, and mental-health history and consequently failed to present considerable evidence concerning a defendant's background and character. *Cf. Williams v. Taylor*, 529 U.S. 362, 395–96 (2000) (holding that counsel's performance was deficient when their investigation failed to uncover "extensive records" filled with mitigation evidence concerning the defendant's family history, education, mental health, and rehabilitation); *Wiggins*, 539 U.S. at 523–25 (holding that counsel's performance was deficient when they failed to expand their investigation into the defendant's life history "after having acquired only rudimentary knowledge of his history from a narrow set of sources," especially when those sources indicated the existence of helpful mitigation evidence). Hughbanks's counsel investigated his family, social, and psychological background, including whether he suffered from any mitigating mental illnesses at the time of the offense. The record reflects that counsel obtained and reviewed Dr. Schmidtgoessling's report, which mentioned the sexual abuse, as well as the records on which she relied. *See* R. 166-19 (Dr. Schmidtgoessling Report at 2–5) (Page ID #8999–9002); R. 163-16 (Schmidtgoessling Test., Mitigation Hr'g Tr.) (Page ID #3700–01, 3712–13) (showing that defense counsel reviewed the report and referenced it during his cross-examination of Dr. Schmidtgoessling); *see also* R. 166-19 (Letter from Dr. Schmidtgoessling) (Page ID #9099) (confirming that Dr. Schmidtgoessling sent defense counsel her report and all of the clinical information she collected on Hughbanks). Furthermore, counsel interviewed several family members and relied on evaluations of Hughbanks's mental health performed by professionals who had treated Hughbanks throughout his teenage and adult years and close to the time of the murders. As a result, the jury and Hughbanks's sentencing judge heard detailed

descriptions about Hughbanks's struggles with substance abuse and mental health, his repeated diagnoses of bipolar disorder, schizophrenia, and depression, and his troubled childhood, including the emotional and physical abuse he suffered from his parents, as well as the role his background played in his mental state at the time of the offense. Counsel presented a sympathetic picture of Hughbanks that was far from incomplete.

Nevertheless, counsel's omission of the trauma that Hughbanks suffered from two separate incidents of sexual abuse does not immediately strike us as a reasonably strategic decision. But the stringent requirements of AEDPA constrain our review. We must decide whether it was objectively unreasonable for the Ohio Court of Appeals to conclude that "proof of the existence of mitigation evidence that was not presented at trial, but that might have supported an alternative theory of mitigation, does not constitute proof of counsel's ineffectiveness, when . . . the record demonstrates that counsel presented the case in mitigation competently in view of the facts available to them." *Hughbanks*, 2003 WL 131937, at \*12. This is a high bar for Hughbanks to clear. He must "show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. We "must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 102.

We cannot conclude that the Ohio Court of Appeals was objectively unreasonable. Neither Dr. De Silva nor Dr. Schmidtgoessling opined that those traumatic events had any impact on their diagnoses of whether Hughbanks suffered from mental illness at the time of the offense. In fact, Dr. Schmidtgoessling specifically determined that Hughbanks did not present "any symptoms of Post Traumatic Stress Disorder secondary to these traumas." R. 166-19 (Dr. Schmidtgoessling Report at 3) (Page ID #8999). Faced with Dr. Schmidtgoessling's uncontradicted finding, counsel might have believed that presenting evidence of the sexual assaults would not be a viable mitigation theory as compared to the mental-health issues about which Dr. De Silva was prepared to testify. We may not find this argument to be persuasive or

correct, but it is not so lacking in justification that no fairminded jurist could find it to be consistent with *Strickland*'s objective standard for reasonable performance. *See Strickland*, 466 U.S. at 690–91. Furthermore, it was not unreasonable for the Ohio Court of Appeals to conclude that "the other evidence presented by trial counsel raised their performance above the minimum level of competence required by *Strickland*." *Campbell*, 260 F.3d at 556.

In sum, we conclude that, under the deferential review required by AEDPA, Hughbanks has not shown that the Ohio Court of Appeals was objectively unreasonable in determining that Hughbanks's counsel did not perform so deficiently as to violate the first *Strickland* prong. Accordingly, we need not address whether the Ohio court's conclusion in regard to the prejudice prong was also objectively reasonable. Therefore, we affirm the district court's denial of habeas corpus based on Hughbanks's claim of ineffective assistance of counsel.

### III. CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's denial of a writ of habeas corpus.

―――――――――

**CONCURRENCE**

―――――――――

JULIA SMITH GIBBONS, Circuit Judge, concurring.   I concur in the majority's resolution of the ineffective assistance of counsel claim and agree with the ultimate resolution of the *Brady* claim.  But I quibble with the majority's categorization of several pieces of evidence as suppressed or favorable to Hughbanks and thus subject to materiality analysis.  For example, I would dispose of the claims about witness reports about individuals seen near the Leeman home near the time of the murder and the FBI VICAP report and investigative materials at an earlier point in the *Brady* analysis.  The point I make is a small one, however, because the majority opinion ultimately concludes that none of the information at issue was material within the meaning of *Brady*, a conclusion with which I agree.  I write separately only to note that I do not agree with or join all of the majority's analysis of the *Brady* claim.