NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0526n.06

Case No. 24-5052

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| DARRYLE COOPER, | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

**FILED**
Dec 17, 2024
KELLY L. STEPHENS, Clerk

Before: BOGGS, GIBBONS, and NALBANDIAN, Circuit Judges

**NALBANDIAN, Circuit Judge**. Darryle Cooper was part of a drug-trafficking operation that moved kilos of heroin across the country. Law enforcement arrested Cooper after a heroin delivery in April 2015. A federal jury convicted him in 2018. Cooper moved for a new trial, alleging that the prosecution did not disclose exculpatory cellphone-location data that placed him several miles away from the heroin delivery. The trial court at first granted the motion. But then the prosecution realized the data was in Central Time rather than Eastern Time undermining the exculpatory nature of the suppressed data. On reconsideration, the trial court agreed with the government and found that the evidence was in fact not material to Cooper's guilt or innocence. Cooper now appeals. Because we agree that the evidence was not material, we AFFIRM.

## I.

The Drug Enforcement Administration (DEA) and Louisville Metro Police Task Force officers began investigating a narcotics trafficker known as "Boonie" in November 2014. Law

enforcement had received a tip that Boonie was moving heroin from Los Angeles to Louisville. They believed that he used several stash houses in Louisville, including a home on Commander Drive and an apartment on Second Street. Officers searched the trash outside the Commander Drive house and uncovered an energy bill with Cooper's name on it. From there, they found his phone number in a database and obtained a search warrant to receive near real-time, precise location information from the phone company. The phone generated a "ping" every fifteen minutes documenting its GPS location, which the phone company sent to law enforcement. The location of the ping could be within nine feet of the phone's actual location.

On March 31, 2015, Cooper's phone pinged in Los Angeles. The phone then traveled to Indianapolis and then to the Commander Drive house. On April 2, officers intercepted a call from another suspect involved in the operation saying that drugs would be available for pickup in Louisville the next day. Officers used cameras outside the Commander Drive house and the Second Street apartment to follow, what the government alleges, was the drug delivery on April 2. At 1:44 p.m., cameras showed a black Toyota Corolla rented in Cooper's name leaving Commander Drive. And at 1:57 p.m., cameras showed the car arriving at the Second Street apartment. According to testimony at trial, Google Maps estimates the two residences are a 12-minute drive apart. The camera then showed another suspect, Ronald Williams, approaching Cooper's rental car and removing a duffle bag from the trunk. The camera did not capture the identity of the driver of Cooper's rental car.

On April 3, law enforcement executed a search warrant at the Commander Drive house. Cooper was the only person there, and no drugs were found. Instead, the officers found a safe with roughly $276,000 in cash, an alleged drug ledger, a digital money counter, a paper shredder, a vacuum sealer, axle grease, saran wrap, and two firearms.

2

During the search, officers watching the cameras at the Second Street apartment saw Williams arrive there. Hoping he had the drugs, several officers went to apprehend him. Sure enough, the officers saw him walk out of the apartment with the same duffel bag from the day before and put it into another car. The officers conducted a traffic stop on that car and recovered the bag with four kilos of heroin inside. Based on this evidence, a grand jury indicted Cooper on three counts: (1) conspiracy to possess and distribute heroin, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1); and (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).

Prior to trial, Cooper asked the government for "detailed disclosure of the circumstances surrounding the use of any electronic surveillance in association with this case." R.456, Def.'s Resp. to Ct. Order on Mot. for New Trial, p.3, PageID 2639. The government did not turn over the ping data from the cellphone company. But it did provide the search warrant for the cellphone data and a DEA report describing the data.

At trial, the government relied on three core types of evidence: (1) surveillance-camera photos from the Commander Drive house and the Second Street apartment, (2) testimony from officers involved in the investigation who explained the phone ping data, and (3) testimony from multiple co-defendants connected to Cooper and the drug-trafficking organization. The government used the phone ping data to track Cooper's travel from Los Angeles to Louisville but not for the drug delivery itself. For that, the government used co-defendant testimony outlining Cooper's involvement in the deal and surveillance photos depicting Cooper's rental car moving between the Commander Drive house and the Second Street apartment. During cross-examination

3

of one of the officers, Cooper's counsel asked for the cellphone ping data.[1] But Cooper's counsel withdrew the request the next day because the government told him it had only the raw data. So it would appear as "sheets of numbers" that "would be indiscernible . . . in the format that [the government had] them." R.396, Trial Tr., p.5, PageID 2116.

The government also presented testimony from multiple co-defendants connected to Cooper and the drug delivery. First, the jury heard from Ebony Burrus. Burrus was dating Boonie—the ringleader of the drug-trafficking operation. She knew Cooper by the nickname Kong and said she often saw him at the Commander Drive house. She went to the house with Boonie so that he and Cooper could count and seal money earned from drug sales. Next, Williams testified. He admitted dealing heroin and claimed Boonie was his supplier. He admitted that, on the day before the search, he got four kilos of heroin from Cooper and placed it the car where the officers found it.

Lastly, Boonie testified. His real name is Marlin Polk. He outlined Cooper's role in the drug operation. Cooper would get the drugs from a source and give them to Polk for further distribution. Polk described the Commander Drive house as a safe house where he and Cooper would count, vacuum seal, and keep money from their business. Cooper would then ensure the money got to their suppliers. Finally, Polk testified that Cooper met him in California about a week before DEA seized the drugs. They discussed the deal, and Cooper agreed to help transport the drugs to Louisville.

---

[1] It is unclear whether Cooper's counsel asked for the tracking information for Cooper's phone or another phone. Cooper's phone used a 470 area code. Officers were also tracking a 909 area code not associated with Cooper. This distinction was made clear on the second day of trial. But on the first day, Cooper's counsel seemed to ask the officer for the tracking data relating to this other, 909 number rather than Cooper's number. The trial court found it likely that counsel was seeking the number connected to Cooper because the request followed a discussion of the person using the Commander Drive house.

Cooper's counsel sought to impeach the credibility of all three witnesses by highlighting their plea deals with the government, in which they received lenient sentences in exchange for their testimony against Cooper. Cooper also testified. He denied being part of the heroin operation and claimed that no drug activity occurred at the Commander Drive house while he was renting it. He admitted that the items seized in the house were his, except for one gun. But he claimed to use them for reasons unrelated to drug activity. He also denied participating in the April 2 heroin delivery. He said the rental car was his but that he neither drove to the Second Street apartment to meet Williams nor saw the duffel bag with the heroin.

The jury convicted Cooper of all three counts and the trial court sentenced him to 180 months of imprisonment, followed by five years of supervised release. Cooper moved for post-trial discovery to compel the government to turn over the cellphone ping data. The government voluntarily provided the information.[2]

And Cooper appealed. *United States v. Cooper*, 838 F. App'x 976 (6th Cir. 2021). Among other things, he raised a *Brady* claim, arguing that the government failed to disclose cellphone ping data and video footage from the Second Street apartment camera. *Id*. at 979. This court affirmed, finding that, although the government eventually gave Cooper this data, Cooper never moved for a new trial and never made this evidence part of the record in the district court. *Id*. So we could not evaluate the claim. *Id*.

Cooper then went back to the district court and moved for a new trial based on newly discovered evidence. In the motion, Cooper focused on the undisclosed ping data. He argued the data showed he was never at the Second Street apartment on the day of the alleged heroin delivery.

---

[2] It's unclear why the government told Cooper's counsel during trial that it couldn't provide usable ping data, but then decided that it could after trial.

Cooper claimed that the data showed he was roughly 6.5 to 7.5 miles from the apartment at the time the government claimed he was there. The government responded that the evidence was not new, not material, and unlikely to produce an acquittal.

The trial court disagreed. It found that the government violated its *Brady* obligations by suppressing the ping data, the data was exculpatory, and that it was material because it proved Cooper did not participate in the delivery. Also, the only evidence placing Cooper at the delivery site was the testimony of the other defendants, who had bias and credibility issues. So the court granted Cooper's motion for a new trial.

But then the government noticed something: the ping data was in Central Time, not Eastern Time as everyone had assumed. So the data did not place Cooper miles away from the apartment at the time of the heroin delivery. It does not say he was *anywhere* at that time because the network could not locate his phone, possibly because it was turned off. Given this new information, the trial court reconsidered its grant of a new trial. This time, the judge denied Cooper a new trial because the data was not material, even though the court still found the government improperly suppressed the data, and it favored Cooper. It concluded that the abundance of evidence against Cooper, and the likely explanation that he turned his phone off during the delivery to evade detection, meant there was no reasonable probability that the jury would have seen the charges in a different light if it heard about the ping data. Cooper appealed.

## II.

Generally, we review a district court's decision to deny a new trial for an abuse of discretion. *United States v. Dado*, 759 F.3d 550, 559 (6th Cir. 2014). "The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *Id.* (internal quotation marks omitted). But when the new trial

motion is based on a *Brady* violation, we review the court's determination about the existence of a *Brady* violation de novo. *Id.* Said differently, "we give considerable deference to the district court's factual findings and factual conclusions, but we review *de novo* the district court's conclusions about the legal significance of those findings." *Id.*

**A.**

Cooper argues that he is entitled to a new trial because the government suppressed evidence that would lead to his acquittal. In *Brady v. Maryland*, the Supreme Court held that the prosecution violates a defendant's due-process rights when it suppresses evidence favorable to the accused and the evidence is material to either guilt or punishment. 373 U.S. 83, 87 (1963). We have since clarified the three elements of a *Brady* violation: (1) the government suppressed evidence; (2) the evidence favored the defense; and (3) the evidence was material. *Dado*, 759 F.3d at 559–60. The defendant bears the burden of proving all three. *Id.* at 559.

Cooper argues that (1) the government suppressed the cellphone ping data from April 2, 2015, the day of the heroin delivery, (2) this data favored him because it shows a lack of support for the government's allegation that he participated in the delivery, and (3) the evidence is material because it directly contradicts the testimony that he was at the Second Street apartment during the delivery. Appellant Br. at 23–24. Even if Cooper met the first two elements of the *Brady* test, we agree with the district court that Cooper's claim fails because the evidence was not material.

The favorability requirement is distinct from materiality. Just because the prosecution suppressed evidence favorable to the defendant does not mean that the evidence would have led the jury to a different result. *See Hughbanks v. Hudson*, 2 F.4th 527, 542 (6th Cir. 2021). Rather, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *Dado*, 759 F.3d at 560

(quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (holding that the "touchstone of materiality is a 'reasonable probability' of a different result").

We have explained that suppressed evidence is not material when it "falls short of mounting a plausible counter-narrative." *Hughbanks*, 2 F.4th at 542. Even if suppressed evidence may help the defense "craft a story suggesting that another person committed the crime," it still may not be material. *Id.* If the defendant "would not have been able to produce a name or description of an alternate suspect that any undisclosed evidence could corroborate," the evidence is not material. *Id.* This is especially the case when "key parts of the suppressed evidence support the State's theory rather than undermine it." *Id.* At bottom, if the evidence has a "relatively weak exculpatory" effect, it will not "put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (internal quotation marks omitted).

To start, Cooper asserts the data would undermine confidence in the verdict—and is therefore material—because it "directly contradict[s]" the government's testimony that he took part in the April 2 heroin delivery. Appellant Br. at 24. But he relies on the incorrect premise that the "tracking data would prove that he was not at the Second Street apartment on April 2nd during the alleged drug deal." *Id.* at 23. This might have been true if, as the district court mistakenly believed, the data was in Eastern Time. But because the data was in Central Time that is not the case. Cameras at the Second Street apartment showed that the heroin delivery occurred at roughly 1:57 p.m. Eastern Time. Originally, the ping data seemed to show Cooper was miles away from the scene of the delivery at that time. But really, it showed that he was miles away from the scene at roughly 1:57 p.m. *Central Time*, which is 2:57 p.m. *Eastern Time.* During the actual time of the delivery, an hour earlier, the network could not locate Cooper's phone. So there is no ping data to

prove that he was either at the Second Street apartment or somewhere else. The data proves nothing about where Cooper was during the alleged deal.

Because the data proves nothing about Cooper's location during the deal, it does nothing to improve the arguments he already made at trial. The data (or more precisely the lack of data) may have allowed Cooper to craft a story suggesting that another person delivered the drugs. But that is the exact argument Cooper already made at trial. On the stand, he admitted that the rental car seen at the delivery site was his but claimed that he did not drive it to the Second Street apartment to meet Williams and deliver the duffel bag with heroin. The ping data would not have improved this argument because it says *nothing* about where Cooper was at the time of the delivery and it offers no alternative of who could have been delivering the heroin. Ultimately, it "falls short of mounting a plausible counter-narrative." *Hughbanks*, 2 F.4th at 542. If anything, "key parts of the suppressed evidence support the [government's] theory rather than undermine it" because the government could argue that Cooper turned his phone off to evade detection during the delivery. *See id.*

The tracking data also does nothing to counter the other, significant evidence against Cooper. Burrus and Williams testified to Cooper's active involvement in the heroin operation and the April 2 delivery. Polk (Boonie) also testified to Cooper's role in the planning and execution of the April 2 deal. Cooper hints that because Williams is the only witness to directly place him at the scene of the delivery, and because Williams has credibility issues, the suppressed evidence could have swayed the jury against believing Williams's testimony. Appellant Br. at 24. But again, the fact that Cooper's location was unknown at the time of the delivery does little to undermine Williams's and the other two defendants' testimony, particularly since much of that testimony reflects Cooper's larger role in the drug operation in addition to his participation in the

April 2 delivery. So given the "relatively weak exculpatory nature" of the cellphone data, we do not think it "put[s] the whole case in such a different light as to undermine confidence in the verdict." *See Hughbanks*, 2 F.4th at 542 (internal quotation marks omitted).

Because Cooper has failed to show that the suppressed evidence was material, the prosecution did not violate *Brady*. And because there was no *Brady* violation, the district court did not abuse its discretion in denying Cooper's motion for a new trial.

## III.

Because Cooper is not entitled to a new trial, we affirm.